[L. A. No. 23327. In Bank. Mar. 8, 1955.]

LAZARD LIPPMAN, Respondent, v. SEARS, ROEBUCK AND COMPANY, Appellant.

John L. Wheeler, John J. McCue and Lewis Watnick for Appellant.

Mark L. Herron, Fred Horowitz and Alvin F. Howard for Respondent.

EDMONDS, J.—The rental agreed to be paid by Sears, Roebuck and Company for a building leased to it by Lazard

Lippman was $285 per month and an additional amount based upon the total sales made by the lessee. The appeal of the lessee from an adverse judgment presents for decision the question as to the amount of rent a lessor is entitled to receive under a "percentage," lease from a tenant who discontinues the use of demised property for retail sales and occupies it for other purposes.

Under the lease executed by Lippman and Sears the premises were "to be occupied for the sale and storage of general merchandise and for servicing automobiles, automobile tires, batteries and accessories." Sears promised to pay "as rent for said demised premises the sum of . . . ($285.00) in advance, upon the first day of each month during the term hereof, said monthly installments of rental being hereinafter for convenience respectively referred to as 'minimum monthly payments' . . .. In the event the net sales . . . made by Tenant upon the demised premises during any lease year of the term hereof, are in excess of . . . ($146,800.00), then Tenant will pay as 'additional rent' hereunder for said lease year, a sum equivalent to 2½% of the first . . . ($163,200.) of such excess and 2% of the remainder thereof, within fifteen (15) days after the end of said lease year."

If the lessee assigned or sublet the premises, it agreed to pay as rent "the average monthly rental paid by Tenant to Landlord during the twelve months' period last preceding such assignment or subletting, but in no event shall such monthly rental be less than" $285. In the event of an abandonment of the premises, the lessor is to re-let them at "the best rent obtainable." Sears agreed to pay "as damages" the difference between such rent and the unpaid balance of "the rent herein reserved."

The term of the lease was 10 years. After operating a retail sales business in the building for several years and paying both "minimum monthly payments" and "additional rent," Sears transferred its sales business to another location and used the Lippman premises solely for the storage of merchandise. Only "minimum monthly payments" were made during 1950, the final year of the term, and the lessor is suing to recover "additional rent" for that year.

In his complaint, filed after the expiration of the lease, Lippman alleged that the lessee had agreed to conduct a retail sales business on the premises and, if it ceased to do so, to pay "a monthly rental equal to the average monthly rental it had paid for the twelve months immediately preced-

ing the month in which it ceased doing business.'' Sears ceased doing business at that location in January, 1950, it was alleged, and for that year there was due him unpaid rent in the sum of $17,024.74, the amount received by him as "additional rent" for the preceding year.

The answer denied generally these allegations. As an affirmative defense, Sears pleaded that an agreement executed by the company and Lippman amounted to a settlement of his claims.

During the trial, extensive testimony regarding preliminary negotiations and circumstances surrounding the execution of the lease was admitted over objection by counsel for Sears that it was incompetent, irrelevant and immaterial and tended to vary the terms of the written lease. That testimony showed the following facts:

For several years prior to the execution of the lease from Lippman, Sears had occupied the building as tenant of one Russell under a written lease calling for the payment of a rental of $285 per month. In 1940, a large part of the premises was destroyed by fire. Sam Jones, manager of Sears' property department, suggested to Lippman, who was lessor of other property occupied by the company, that he purchase and reconstruct the building for investment. According to Jones, the building, reconstructed after use as a garage, had not been completely satisfactory to the company's purposes, and he made specific suggestions for rebuilding it. Lippman was promised ''a good lease.''

After inspecting the premises, Lippman presented to Jones his estimate as to the costs of purchase and reconstruction and stated he would require a lease with a rental of ''at least $800 a month.'' Jones made a counterproposal of a percentage of profits, to enable Lippman to ''gamble'' with Sears on the volume of sales, with a guarantee of a minimum of $285 per month. According to Lippman's testimony, he was told that it was necessary to fix the guarantee at the latter figure because the Russell lease was still in effect and the ''main office'' would not approve a new lease unless the minimum rental was the same amount. Jones testified that ''the sum arrived at . . . was a nominal sum to take care of fixed expenses, and . . . the profit on [Lippman's] investment would be arrived at through a percentage of sales.''

Lippman purchased the building and began making the contemplated improvements, which totaled in cost more than $75,000, exclusive of overhead, interest, taxes and the value

of Lippman's own services as contractor. Sears took possession while the construction work was in progress and before the execution of a lease. A short time later, it submitted to Lippman construction plans and a written lease to which was attached a layout of the proposed store. After further negotiations with regard to the amount of rent, Lippman signed the lease, and it went into effect on January 1, 1941.

Some time later, Lippman acquired vacant property adjacent to the building and offered it to Sears for use as a parking lot. It was accepted but an increase of rent was declined by Sears' representative who suggested that Lippman would be compensated by an increase in sales. Lippman agreed to this proposition.

After the expiration of the lease, a new one was negotiated, calling for a month-to-month tenancy with a rental of $300 per month. Sears continued to occupy the building under the new lease for some four months, until served with notice to remove.

In arguing the objection to this evidence, counsel for Sears stated that it might be received for the purpose of reforming the lease but that the writing itself is unambiguous. Later trial judge invited an amendment to the complaint to state a cause of action for reformation or other equitable relief, but the offer was declined. He then overruled the objection, stating that it might be received to establish an implied covenant to pay a reasonable rental upon an abandonment of the lease or to show that the guaranteed minimum rental was not substantial or adequate.

The findings of fact declare that the lease provided a minimum monthly rental, which "was intended to be and was, in fact, a nominal rental and was not a substantial or adequate minimum rental." The lease further provided, it was found, that "[i]n the event the defendant did not occupy said premises for the sale of general merchandise but used said premises for the storage of merchandise, it was to pay plaintiff a monthly rental equal to the average monthly rental it had paid for the twelve months immediately preceding the month in which it ceased to use said premises for the sale of merchandise." According to another finding, Sears ceased to occupy the premises for the sale of merchandise on November 1, 1949, and thereafter used the premises solely for the storage of merchandise. As a conclusion of law from these findings, the court decided that Lippman is entitled to recover from Sears $17,004.82, the difference between the minimum

monthly payments made in 1950 and the total amount of rent received during 1949.

Sears contends that the lease does not expressly require it to continue its retail sales business for the full term of the lease or, in lieu of its doing so, to pay any amount in excess of the guaranteed minimum rental. And, the argument continues, because the lease is complete in stating the obligations of the parties with regard to the payment of rent, there is no basis for implication. It urges that the admission of extrinsic evidence to establish such a covenant violates the parol evidence rule. Sears also disputes the materiality of the finding that the guaranteed minimum rental was not substantial or adequate, and if that finding is material to any issue, it asserts, there is no substantial evidence to support it.

The clause which states the uses to which the property could be put cannot reasonably be construed as an express covenant on the part of Sears to continue in all of the enumerated activities. It is included in the portion of the lease which describes the nature and location of the property, and there is no language of undertaking by either party in connection with it.

■ The rules which govern implied covenants have been summarized as follows: ''(1) the implication must arise from the language used or it must be indispensable to effectuate the intention of the parties; (2) it must appear from the language used that it was so clearly within the contemplation of the parties that they deemed it unnecessary to express it; (3) implied covenants can only be justified on the grounds of legal necessity; (4) a promise can be implied only where it can be rightfully assumed that it would have been made if attention had been called to it; (5) there can be no implied covenant where the subject is completely covered by the contract.'' (*Cousins Inv. Co.* v. *Hastings Clothing Co.*, 45 Cal.App.2d 141, 149 [113 P.2d 878]; see also *Stockton Dry Goods Co.* v. *Girsh*, 36 Cal.2d 677, 681 [227 P.2d 1, 22 A.L.R.2d 1460].)

■ As a general rule, it is held that a statement as to the purpose for which premises are leased does not imply a covenant by the lessee that he will engage in that use, but he may cease to use the premises for any purpose. (See anno. 46 A.L.R. 1134.) Some courts have implied such a covenant when the rental for the premises is based upon a percentage of the proceeds from the business for which they

are let. (*Plassmeyer* v. *Brenta,* 24 N.J.Super. 322 [94 A.2d 508, 510]; *Selber Bros.* v. *Newstadt's Shoe Store,* 194 La. 654 [194 So. 579]; *Marvin Drug Co.* v. *Couch,* (Tex.Civ. App.) 134 S.W.2d 356; see anno. 170 A.L.R. 1113, 1117-1121.) These cases rest upon a theory of interpretation similar to that employed in the consideration of "output" contracts, where the courts have found "from the business situation, from the conduct of the parties, and from the startling disproportionate burden otherwise cast upon one of them, a promise implied in fact by the seller to continue in good faith production or sales, or on the part of the buyer to maintain his business or plant as a going concern and to take its bona fide requirements. In other words, this view implies an obligation to carry out the contract in the way anticipated, and not for purposes of speculation to the injury of the other party . . .." (1 Williston on Contracts [rev. ed. 1936], § 104A, pp. 357-358.) ▇ Where the rental for use of a building is based upon a percentage of sales, the lessee reasonably may be said to covenant impliedly that he will use good faith to insure a continuation of them.

The author of the annotation in 170 American Law Reports states: "greater leeway is allowed to the lessee of a percentage lease with respect to the use and occupancy of the premises and the conduct of the business contemplated where there is a substantial guaranteed minimum rental, upon which the lessor mainly relies, with a percentage of the income made an additional obligation, than where the sole rental is made payable from a percentage of the income." (P. 1117.) The intention of Lippman and Sears in regard to the monthly payments of $285 is of decisive importance in determining the rights of the parties.

In *Cousins Inv. Co.* v. *Hastings Clothing Co.,* 45 Cal.App. 2d 141 [113 P.2d 878], the lessee had occupied the premises for several years under a written lease calling for the payment of a monthly rental of $2,750. The lease was renewed but with the rental increased to $5,500 per month plus taxes. After the lessee had found it difficult to pay that amount of rent, the parties agreed to a revision of the lease to provide for a "reserved rental" of $4,000 per month plus 5½ per cent of the gross income to be paid in such a manner as to limit the total rent during a six-month period to an average of $5,500 per month. With a little more than a month remaining under the revised lease, the lessee removed to a different location and, for the final month, paid only the

minimum rental. The lessor sued for rent upon the theory that after the lessee had impliedly covenanted to remain in business at that location for the full term of the lease, he breached that covenant. The court held there was no such covenant. There was nothing in the nature of the transaction, it concluded, "to justify a finding that the implied covenant was indispensable to effectuate the intention of the parties, nor can it be supported on the grounds of legal necessity. On the contrary, as defendant argues, it would seem that the covenant to pay the minimum rental was inserted in the lease as a substitute for an express covenant requiring the continuous operation of the demised premises; that when the rental reserved in a lease is based upon a percentage of the gross receipts of the business, with a substantial, adequate minimum, there is no implied covenant that the lessee will operate its business in the demised premises throughout the term of the lease." (P. 149.)

This conclusion was followed in *Masciotra* v. *Harlow*, 105 Cal.App.2d 376, 381 [233 P.2d 586]. In that case the defendant leased property for the purpose of operating a restaurant, promising to pay a monthly rental of 7 per cent of the gross receipts with a minimum of $250. After several years of successful operation under the name "Pump Room," the defendant opened a new restaurant at a different location, transferring the name "Pump Room" and two-thirds of the personnel to the new location. Defendant continued to operate a restaurant on the old premises, but business fell off and the rentals remained at the minimum. The lessor sued contending that "there is an implied covenant that lessee would, during the term of the lease, so conduct his business on plaintiff's premises as to make it mutually profitable to both parties." (P. 379.) The court refused to imply a covenant, concluding that "the parties considered the stipulated minimum rent to be in itself fair and adequate and any additional sum was in the nature of a bonus which the lessee was willing to pay if his business exceeded his expectations." (P. 380.)

In both the Cousins and Masciotra cases the minimum rental provision was held to be adequate and substantial. Neither decision, therefore, is squarely authority for the proposition that a covenant to remain in business may be implied from an inadequate or insubstantial minimum, and no case has been found which so holds. However, that legal principle follows logically from the rule which permits the implication

of a covenant to remain in business where the rent is based entirely upon a percentage of sales, and by their reliance upon the conclusion that the minima involved were adequate, the Cousins and Masciotra cases lend support to that view.

■ Sears takes the position that the admission of extrinsic evidence to establish an implied covenant violates the parol evidence rule. If the purpose in receiving such evidence were solely to read into the written lease an omitted provision, or one contrary to its terms, Sears' position would be correct. ■ As was said in the Cousins Investment and Stockton Dry Goods cases, the court may imply such a covenant only where it is a natural implication from the language used or is indispensable to effectuate the expressed intention of the parties. But, as the trial judge stated when ruling upon this evidence, it was admitted also in connection with the question as to whether the minimum monthly payments constituted a substantial minimum rental.

■ According to the rule followed by a majority of this court, extrinsic evidence to explain the terms of an instrument may be received only when an ambiguity is apparent to the reader. (See *Union Oil Co.* v. *Union Sugar*, 31 Cal.2d 300, 306 [188 P.2d 470].) ■ The term "minimum monthly payments" has no fixed legal significance; its meaning can be ascertained only by reference to the circumstances in which the lease was executed. Extrinsic evidence, therefore, was properly admitted to show those circumstances.

■ Sears maintains that the evidence does not support the finding that $285 per month "was intended to be and was, in fact, a nominal rental and was not a substantial or adequate minimum rental." Ordinarily, when used in connection with monetary obligations, the word "nominal" denotes "a trifling sum" (Black's Law Dict., 4th ed. 1951, p. 469). As Sears correctly contends, more than that amount was required by the lease. But a finding that, within the contemplation of the parties, $285 per month was not a substantial and adequate minimum rent to be paid in lieu of a percentage of the sales is a sufficient basis for a determination that Sears impliedly covenanted to use the demised premises for the sale of merchandise during the entire term of the lease. It was not necessary that the trial court go farther, and the characterization of the minimum rent as nominal is superfluous.

■ The trial judge was extremely liberal in permitting the introduction of evidence as to events occurring during

negotiations. Undoubtedly some of the testimony went beyond that properly admissible to show the circumstances surrounding the execution of the lease. However, a consideration of the entire record compels the conclusion that such error was not prejudicial. The great preponderance of the evidence properly admitted tends to show that the minimum rental provision, in the contemplation of the parties, was not a substantial and adequate payment in lieu of payment of a percentage of the proceeds from the business contemplated by the lease.

The lease was made only after Lippman had repaired and remodeled the building at a substantial cost and with the understanding that he would "gamble" with Sears upon the amount of its retail sales. Later improvements were made pated increase in the amount of sales resulting from Sears' and furnished to Sears free of any charge except the antici- use of them. Although some inference that the minimum rent provided was adequate and substantial might be drawn from the similarity in amount of rent charged before and after the term of the lease, it is rebutted by the direct evidence that Sears' tenancy under the new agreement was offered to Lippman as an inducement for him to purchase and repair the building. Finally, there is direct evidence that when the lease, which was drawn by Sears, was presented to Lippman he was told by the lessee's representative that the provision now in controversy had been inserted to provide a sum to "take care of fixed expenses" and to obtain the approval of the "main office."

 For breach of an implied covenant to remain in business, the measure of damages ordinarily is the amount which the lessor would have received from his share of the proceeds of the business had the lessee operated it in its usual and customary manner. (*Cf. Marvin Drug Co.* v. *Couch, supra,* 134 S.W.2d 359.) In the present lease, however, the parties have made specific provision for the payment of damages in the event the lessee ceased to occupy the premises. If it sublet or assigned them, it guaranteed that the lessor would receive "the average monthly rental paid by Tenant to Landlord during the twelve months' period last preceding such" subletting or assignment. In the event the lessee abandoned the premises, it agreed to pay as damages the difference between the best rent obtainable by the lessor from a reletting of them and "the rent herein reserved." In effect, these provisions liquidated the damages

to the lessor from a loss of a percentage of the income from the lessee's business if it ceased to occupy the premises. It is a reasonable implication from these provisions that the parties agreed upon the same measure of damages when that loss resulted from an abandonment of the integral purpose for which the lease was made. There was no error in the award of damages.

The judgment is affirmed.

Gibson, C. J., Shenk, J., Carter, J., Traynor, J., Schauer, J., and Spence, J., concurred.