Opinion
 

 HANSON, J.
 

 The Happy Steak, Inc. (hereinafter referred to as franchisor) and Larry D. and Mary S. Cordonier, husband and wife (hereinafter referred to collectively as Cordonier) appeal from a judgment of dismissal as to defendant Central Shopping Plaza Associates (hereinafter referred to as Plaza) entered by the trial court after the general demurrer of Plaza to plaintiffs’ complaint for damages for breach of a lease was sustained without leave to amend.
 

 Facts
 

 The complaint which seeks damages for breach of lease alleges, in substance, the following facts: That franchisor is a California corporation that franchises restaurants; that Cordonier as franchisee engaged in business in Camarillo, California, under the fictitious name “The Happy Steak”; that franchisor on January 24, 1971, entered into a written 20-year lease for approximately 3,410 square feet of space in Plaza with E. J. Friedman Company, Inc. (hereinafter referred to as Friedman) for the purpose of operating a “Happy Steak” restaurant; that on or about April 7, 1976, Friedman sold Plaza to defendant Washington Mutual Savings Bank (hereinafter referred to as Washington) and assigned to Washington its landlord’s interest in the lease; that construction of the buildings in Plaza had not been completed at the time franchisor entered into the lease, but the buildings were substantially completed by the end of 1971.
 

 Plaintiffs further allege that paragraph 2.5 of the master lease assigned by Friedman, .a copy of which is attached to and incorporated by reference in the complaint, provides: “Landlord agrees that prior to the commencement of the term of this Lease, Landlord will enter into valid and binding leases for minimum lease terms of not less than 20 years each with a chain department store for premises not less than 100,000
 
 *996
 
 square feet on building site A, with a chain supermarket for premises not less than 21,000 square feet on building site B, and with a chain drugstore for premises not less than 18,000 square feet on building site B;” that franchisor and Cordonier were informed and believe that prior to the commencement of the term under the master lease the lessor entered into 20-year leases with W. T. Grant Company for a department store, with Market Basket for a supermarket, and with Value Giant for a drug store; and that Market Basket and Value Giant opened for business in Plaza in September 1971 while W. T. Grant Company opened in October 1971. It is alleged further that on or about February 4, 1971, Cordonier entered a written sublease of the premises leased by the franchisor, and the term of the sublease is one day shorter than the twenty-year term of the master lease; that by the terms of the sublease, which is attached and incorporated by reference in the complaint, Cordonier expressly assumed all obligations of the master lease; that Friedman as lessor consented in writing to the sublease on March 10, 1972; that on or about January 12, 1972, Cordonier took possession of the demised premises and opened to the public a “Happy Steak” restaurant; and that franchisor and Cordonier have performed .each and every term, covenant and condition on their part to be performed under the master lease.
 

 Plaintiffs franchisor and Cordonier further allege that some time during the first quarter of calendar year 1975 W. T. Grant Company and Value Giant ceased operations of the department store and the drug store, respectively, and vacated the premises which consist of about 62 percent of the leaseable space in Plaza; that this space thereafter remained and at the time of filing the complaint (Feb. 1, 1977) still remained vacant; that cessation of operations by W. T. Grant Company and Value Giant constitutes a breach of paragraph 2.5 of the master lease which requires lessor to have three major tenants operating in Plaza for a term of 20 years; that on or about March 30, 1976, franchisor gave written notice to Friedman of the breach of master lease pursuant to article 35 thereof and demanded remedial action; that neither Friedman nor Washington as its assignee took remedial action; and that Washington through its agent, Newman Properties, answered that the cessation of operations by the department store and the drug store and the vacating of premises by said major tenants did not constitute a breach of the master lease.
 

 The complaint alleges, in addition, that sales of Cordonier at the Happy Steak restaurant in the Plaza during calendar 1974 increased at an average rate of 25.5 percent over sales of the same calendar quarter in
 
 *997
 
 1973; that Cordonier had a reasonable expectation that sales would continue to increase at approximately the same rate throughout the next three years; that as a direct and proximate result of the breach of the master lease, sales by Cordonier did not increase at that rate each calendar quarter during 1975 and 1976; that during 1975 the sales increase was only 16.5 percent and in 1976 the sales increase was only 0.5 percent; that the aggregate loss of sales suffered by Cordonier for 1975 and 1976 totals $126,714; that taking into account the variable costs of doing business, Cordonier would have earned a net profit of approximately $59,771 on such sales; that Cordonier was damaged in that amount and will suffer additional damages during 1977 and thereafter until the landlord takes remedial action; and that Cordonier has retained the services of an attorney and incurred reasonable attorney’s fees which they are entitled to recover under article 28 of the master lease should they prevail in this action.
 

 Plaintiff franchisor in a second cause of action as to itself alone realleges and repleads all of the allegations incorporated in the first cause of action; it further alleges that on or about August 22, 1970, it entered into a written operating agreement with Cordonier for the operation of a “Happy Steak” restaurant in Plaza; that by the terms of the operating agreement Cordonier promised to pay to franchisor a continuing 3 percent royalty on monthly gross sales from operation of the restaurant; that as a direct and proximate result of the breach of the master lease by the landlord Cordonier was deprived of sales totaling approximately $126,714 through 1976; that after deducting the 6 percent sales tax the amount of gross sales is $119,542 on which franchisor was entitled to receive a 3 percent franchise fee computed to be $3,586; that franchisor will suffer additional damages during 1977 and thereafter until such time as defendant landlord takes remedial action; and that franchisor is entitled to recover attorney’s fees pursuant to article 28 of the master lease should it prevail in this action.
 

 It appears that Plaza, a California partnership, succeeded to the interest of Washington, assignee of Friedman, subsequent to the time the complaint was filed. Accordingly, with the concurrence of the parties the interest of Plaza will be equated with that of the landlord under the master lease for purposes of this appeal.
 
 [1]
 

 
 *998
 
 Plaza filed a general demurrer to each of the two causes of action on grounds that (1) by plaintiffs’ own admissions landlord performed the conditions precedent of obtaining major tenants, and no breach of the lease was alleged; (2) Cordonier does not allege loss of sales in the years in question hence Cordonier suffered no damages; and (3) Cordonier is an improper party to this action because there is no privity of contract with Plaza as landlord under the master lease. The trial court sustained the general demurrer without leave to amend on the basis of the moving party’s points and authorities. An order of dismissal was entered as to Plaza and plaintiffs appealed.
 

 Issues
 

 Franchisor and Cordonier contend that the trial court erred in granting the general demurrer since (1) Plaza breached an implied covenant in the master lease to continue to have as major tenants supermarket, department and drug stores; and (2) by virtue of Plaza’s breach, plaintiffs sustained damages.
 

 Discussion
 

 The trial court in the present case sustained defendant-respondent’s general demurrer to the original complaint filed by plaintiffs-appellants without leave to amend and dismissed their complaint. Although the record does not disclose whether Cordonier and/or franchisor requested leave to amend, they were foreclosed from amendment by the court’s action. Plaintiffs-appellants apparently assume that their theory of recovery is adequately alleged and make no specific request to amend in their appellate brief. However, “[i]t is axiomatic that if there is a reasonable possibility that a defect in the complaint can be cured by amendment or that the pleading liberally construed can state a cause of action, a demurrer should not be sustained without leave to amend. (3 Witkin, Cal. Procedure, Pleading, § 844, p. 2449; accord
 
 La Sala
 
 v.
 
 American Sav. & Loan Assn.
 
 (1971) 5 Cal.3d 864, 876 [97 Cal.Rptr. 849, 489 P.2d 1113];
 
 Lemoge Electric
 
 v.
 
 County of San Mateo
 
 (1956) 46 Cal.2d 659, 664 [297 P.2d 638];
 
 Beckstead
 
 v.
 
 Superior Court
 
 (1971) 21 Cal.App.3d 780, 782 [98 Cal.Rptr. 779].) . . .”
 
 (Minsky
 
 v.
 
 City of Los Angeles
 
 (1974) 11 Cal.3d 113, 118-119 [113 Cal.Rptr. 102, 520 P.2d 726].)
 

 
 *999
 
 “An order sustaining a demurrer without leave to amend ‘ordinarily constitutes an abuse of discretion, if there is a reasonable possibility that the defect can be cured by amendment.’ (3 Witkin, Cal. Procedure (2d ed. 1971) Pleading, § 844.) Liberality in permitting amendment is the rule, not only where a complaint is defective as to form but also where it is deficient in substance, if a fair prior opportunity to correct the substantive defect has not been given. (3 Witkin, Cal. Procedure (2d ed. 1971) Pleading, § 845; see also
 
 Halsted
 
 v.
 
 County of Sacramento,
 
 243 Cal.App.2d 584, 586 [52 Cal.Rptr. 637],...)...”
 
 (Greenberg
 
 v.
 
 Equitable Life Assur. Society
 
 (1973) 34 Cal.App.3d 994, 998 [110 Cal.Rptr. 470].) Although the complaint is inartfully drafted, it discloses the basis for plaintiffs-appellants’ cause of action and the trial court abused its discretion in dismissing the action without giving plaintiffs-appellants the opportunity to amend their pleading to clarify their allegations.
 

 Plaintiffs-appellants concede on appeal that the express terms of paragraph 2.5 of the master lease require only that the landlord enter into valid and binding 20-year leases with supermarket, department and drug stores “prior to the commencement” of the term of franchisor’s lease. They nonetheless contend that they should be entitled to introduce proof of the intentions of the parties to show that performance of the landlord in obtaining initial leases from major tenants did not satisfy its obligation since as an
 
 implied
 
 term of the master lease the landlord was required not only to obtain, but also to maintain, leases with major tenants throughout the 20-year term of franchisor’s lease for its benefit and for that of its sublessee, Cordonier. This contention is based on the proposition that under California law a covenant to continue operations may be implied in a commercial lease
 
 (Lippman
 
 v.
 
 Sears, Roebuck & Co.
 
 (1955) 44 Cal.2d 136, 142 [280 P.2d 775]).
 

 Defendant-respondent Plaza declares that the plain language of the lease controls and that the provisions of paragraph 2.5 of the lease constitute merely conditions precedent to the commencement of the lease term (Civ. Code, § 1436) which were fully performed by the landlord. Plaza argues that implication of a covenant of continuing performance is not a “legal necessity” but would to the contrary impose upon the landlord an additional economic burden. It asserts that this court is required to give effect to the clear and express language of the contract (Civ. Code, § 1638;
 
 Estate of Wemyss
 
 (1975) 49 Cal.App.3d 53, 59 [122 Cal.Rptr. 134]).
 

 
 *1000
 
 In their complaint, Cordonier and franchisor allege merely that the landlord breached paragraph 2.5 “in that the Lessor was and is required to have three major tenants operating in the shopping center for a term of twenty years.” The
 
 express
 
 language of paragraph 2.5 requires merely that the lessor should procure 20-year leases with three major tenants prior to the commencement of plaintiifs-appellants’ leasehold interest and the trial court apparently sustained Plaza’s demurrer on the basis that the complaint further alleges that the lessor obtained three major tenants. However, plaintiffs-appellants assert that due to the peculiar interdependency among satellite shopping center tenants and major shopping center tenants a covenant of continuing performance may arise by implication under the rules of the
 
 Lippman
 
 case and that they are entitled to introduce parole evidence at time of trial on this issue. Under the rule of the
 
 Lippman
 
 case it appears that in appropriate circumstances a covenant of continuing use may be implied. By a parity of logic a covenant may arise by implication to require the landlord to use good faith to insure continuing use and occupancy by major tenants for the 20-year term of the master lease.
 

 In the
 
 Lippman
 
 case Sears leased a building for use as a retail store agreeing to pay a guaranteed minimum rental of $285 a month plus a percentage of net sales when these exceeded a specified amount. When Sears ceased operating the store, it continued to use the building for storage purposes and paid only the minimum rent. The landlord instituted an action claiming damages as a result of Sears’ breach of an
 
 implied
 
 covenant to continue its retail operations on the premises thus providing the landlord with an opportunity to obtain rentals determined by the percentage clause instead of the lease minimum. The court implied a covenant of continuing use on a finding that the minimum rental payable by Sears was not “substantial or adequate” to constitute full payment for the lease of the building. The court stated: “Where the rental for use of a building is based upon a percentage of sales, the lessee reasonably may be said to covenant impliedly that he will use good faith to insure a continuation of them.”
 
 (Lippman
 
 v.
 
 Sears, Roebuck & Co., supra,
 
 44 Cal.2d 136, 143.)
 

 The court in
 
 Lippman
 
 further identified the circumstances under which covenants may be implied. “The rules which govern implied covenants have been summarized as follows: ‘(1) the implication must arise from the language used or it must be indispensable to elfectuate the intention of the parties; (2) it must appear from the language used that it was so clearly within the contemplation of the parties that they deemed it
 
 *1001
 
 unnecessary to express it; (3) implied covenants can only be justified on the grounds of legal necessity; (4) a promise can be implied only where it can be rightfully assumed that it would have been made if attention had been called to it; (5) there can be no implied covenant where the subject is completely covered by the contract.’ [Citations.]”
 
 (Id.,
 
 at p. 142.)
 

 While the complaint in the instant case would be subject to a special demurrer for uncertainty in that it fails to allege the term that arises by implication and the character of the breach with specificity, that defect is not necessarily fatal. Assuming the facts to be as stated, plain tiff s-appellants may amend to allege the existence of an implied covenant of the landlord not only to obtain but to exercise good faith to maintain for the 20-year period of the master lease, leases for retail operations by the three specified types of major tenants, and the breach of this duty. In the event such a clause is implied, one of the principal issues will be whether the landlord exercised due diligence, once the premises were vacated by W. T. Grant Company and Value Giant, to obtain equivalent leases with other major tenants. Although extrinsic evidence of the intentions of the parties is not admissible to alter the terms of a written agreement, it is the rule that “extrinsic evidence to explain the terms of an instrument may be received . . . when an ambiguity is apparent to the reader. [Citation.] . . .”
 
 (Lippman
 
 v.
 
 Sears, Roebuck & Co., supra,
 
 44 Cal.2d 136, 145.) It is equally clear that “the question of interpretation of the document is one of law; we are required to give the writings our own independent interpretation.
 
 (Estate of Platt
 
 (1942) 21 Cal.2d 343, 352 [131 P.2d 825];
 
 Parsons
 
 v.
 
 Bristol Development Co.
 
 (1965) 62 Cal.2d 861, 866 [44 Cal.Rptr. 767, 402 P.2d 839].) . . .”
 
 (Estate of Wemyss, supra,
 
 49 Cal.App.3d 53, 59.)
 

 We note from our review of the master lease that paragraph 2.5 is found in section 2 headed “Business Rights and Restrictions” rather than in section 3 which deals with the “Term.” As a consequence, it does not appear that this clause was intended by the parties to control solely the time of commencement of the lease as Plaza argues. It is paragraph 3.1 which specifies the choice of dates for commencement of the lease term.
 
 [2]
 
 Paragraph 2.5 by contrast articulates the purposes and restrictions
 
 *1002
 
 upon use of the premises.
 
 [3]
 
 That paragraph, which is entitled “Co-Tenancies,” elaborates on the purposes and interdependent relationships of the tenants providing for the type of major tenants the landlord agrees to obtain, the size of the premises they shall occupy, and the duration of their lease terms. Since section 2 declares the mutual rights and responsibilities of the parties which were given in consideration one for the other it is ambiguous for its failure to indicate whether the landlord has a duty to maintain leases with major retail stores for the 20-year duration of the master lease or any other period.
 

 Although no California cases directly in point have been brought to our attention, Cordonier and franchisor point to cases arising in other jurisdictions where the interdependence of major satellite tenants has been acknowledged. In a Texas case an express provision in a lease provided that the supermarket and other major tenants in a shopping center would “. . . ‘remain as tenants ... at all times during the term of [plaintiffs’] lease . . . .’ ”
 
 (Lilac Variety, Inc.
 
 v.
 
 Dallas Texas Company
 
 (Tex.Civ.App. 1964) 383 S.W.2d 193, 194.) The Texas court upheld the right of a satellite tenant to cancel his lease when the supermarket discontinued retail operations. The court
 
 implied
 
 a covenant of continuing operations stating: “It is true, as appellee says, the lease contract does not in exact words stipulate that A.C.F. Wrigley Stores will not discontinue operation of the supermarket during the term of the lease, but we believe such a provision is necessarily implied from the plain language of the agreement.”
 
 (Id.,
 
 at p. 196.)
 

 A New Jersey court granted the lessor specific performance of an
 
 express
 
 covenant by a retail bakery tenant to continue its operations on the ground that money damages would not be adequate due to the interdependent character of shopping center developments and the relationships of satellites to major tenants.
 
 (Dover Shopping Center, Inc.
 
 v.
 
 Cushman’s Sons, Inc.
 
 (1960) 63 N.J.Super. 384 [164 A.2d 785].) “Courts have recognized the uniqueness of a percentage lease and have generally implied therefrom an obligation on the part of the lessee to occupy the property and to use reasonable diligence in operating the business in a productive manner. [Citations.] But the gravamen of the complaint here is not only the possible loss of additional income by way of a percentage of defendant’s increased gross sales, but the difficulty in measuring the harm that would come from the withdrawal of one of the members of a semi-cooperative enterprise like a shopping center. . .
 
 .’’(Id.,
 
 at p. 791.)
 

 
 *1003
 
 The case of
 
 Ingannamorte
 
 v.
 
 Kings Super Markets, Inc.
 
 (1970) 55 N.J. 223 [260 A.2d 841], is similar to the
 
 Lippman
 
 case. When the supermarket tenant ceased doing business as a market but continued to occupy the premises paying the fixed minimum monthly rent, the court,
 
 implying
 
 a covenant of continued operation, ordered the landlord placed in possession if the supermarket tenant did not promptly resume operations. The court viewing the lease as a whole observed: “[W]hen these lease provisions are viewed in the light of the physical and geographic circumstances there would appear to remain little reason to question that the parties contemplated that the supermarket would continue to be operated as such and that mere payment of rent for an ‘idle store building’ [citation] would not satisfy the purposes of the center or the landlord’s execution of the lease.”
 
 (Ingannamorte
 
 v.
 
 Kings Super Markets, Inc., supra,
 
 260 A.2d 841, 844.)
 

 A New York court which denied specific performance of a lease for the operation of a food market in a shopping center because of the need for judicial supervision for the 13-year balance of the lease acknowledged the potential for damage to other tenants
 
 (Grossman
 
 v.
 
 Wegman’s Food Markets, Inc.
 
 (1973) 43 App.Div.2d 813 [350 N.Y.S.2d 484]). “There is evidence,. . . that a food store will draw people to a shopping center who will also patronize the other stores and that while the food store is closed the business of the other stores will be diminished. There might well be damage to the other tenants while the food store remains vacant, . . .”
 
 (Id.,
 
 at p. 485.)
 

 With respect to damages, plaintiffs-appellants jointly allege that following the closing of W. T. Grant Company and Value Giant retail stores Happy Steak restaurant profits were less than they had reasonably anticipated. While they may be put to the proof that their anticipated profits were not merely remote and speculative, it is not essential for them to allege as damages an actual decline in sales or profits. “The trial court awarded plaintiffs’ recovery for profits they would have gained had it not been for the breach. Profits recovered as the proximate result of a breach are the excess, the net, of revenue over costs; usually they are synonymous with net earnings. [Citations.] . . .”
 
 (Guntert
 
 v.
 
 City of Stockton
 
 (1976) 55 Cal.App.3d 131, 148 [126 Cal.Rptr. 690, 127 Cal.Rptr. 602].)
 

 We note that defendant-respondent by demurrer also raised the issue of privity which was not argued on appeal. There can be no question that the franchisor as tenant under the master lease is in privity with the landlord. Cordonier points out that paragraphs 19.2 and 19.3 of
 
 *1004
 
 the master lease provide, in substance, that the landlord’s consent is not required should the tenant (franchisor) sublet (retaining supervision) or assign its interest in the lease to another entity for the purpose of restaurant operation. It is clear that a sublease was contemplated by the parties when the master lease was executed. The lease also requires the sublessee or assignee to agree in writing to perform and to be bound by the terms of the master lease and Cordonier in fact executed such a written agreement. Thus it appears that mutuality of obligation exists not only between the landlord and the franchisor but between Cordonier as the sublessee and the landlord. In any event, since Happy Steak as franchisor and Cordonier as subtenant restaurant operator have joined as plaintiffs as to the first cause of action, privity does not defeat their action; the second cause of action is alleged by the franchisor alone.
 

 Disposition
 

 The judgment (order of dismissal) is reversed.
 

 Thompson, Acting P. J., concurred.
 

 [1]
 

 Although it is not otherwise disclosed by the record, a footnote to Plaza’s points and authorities in support of its demurrer states as follows: “Washington Mutual Savings Bank, designated ‘landlord’ in the complaint, was dismissed as a party to the instant action without prejudice, on May 4, 1977. For the purposes of this demurrer, the
 
 *998
 
 allegations in the complaint against Washington Mutual Savings Bank are deemed to be allegations against Central Shopping Plaza Associates, sued and served with notice herein as Doe I (hereinafter ‘landlord’).”
 

 [2]
 

 Paragraph 3.1 provides in substance that the 20-year term shall commence on the first to occur of two events: (a) 30 days after services of architect’s certificate of substantial completion or (b) date the tenant for business.
 

 Paragraph 3.2 provides for confirmation of that date in writing and paragraph 3.3 specifies cancellation of the lease if not commenced by August 1, 1972.
 

 [3]
 

 Paragraph 2.1 is the purpose clause of the lease while paragraphs 2.2, 2.3 and 2.4 set forth the exclusivity of tenant’s type of use (food service) and restrictions on that use.