[No. B023800. Second Dist., Div. Five. Dec. 29, 1988.]

COLLEGE BLOCK, Plaintiff and Respondent, v.
ATLANTIC RICHFIELD COMPANY, Defendant and Appellant.

COUNSEL

Tuttle & Taylor, Douglas W. Beck and Wayne Stephen Braveman for Defendant and Appellant.

Stutman, Treister & Glatt and Thomas E. Garcin for Plaintiff and Respondent.

OPINION

ASHBY, Acting P. J.—In this matter the trial court held as a matter of law that in the parties' lease there was an implied covenant of continued operation. We find that although the parties intended the lessee to continually operate a gasoline service station for the entire leasehold period, the trial court acted prematurely and a further factual determination must be made before the covenant is implied.

### STATEMENT OF CASE AND FACTS

In 1965, respondent, The College Block (College Block) owned a parcel of undeveloped real property. College Block signed a 20-year lease with appellant Atlantic Richfield Company (ARCO) in which ARCO agreed to build and operate a gasoline service station on the property.[1] Other provisions of the lease allowed ARCO to build, maintain and replace any buildings ARCO desired in operating a station, obligated ARCO to pay all applicable taxes, prohibited College Block from operating a gasoline station on other properties it owned or controlled, limited ARCO's use of the property to that of a service station, and allowed ARCO the right to cancel the lease if it could not obtain permits required in running a station. Pursuant to the lease, ARCO constructed and then operated for approximately 17 years a gasoline service station on the property.

The rent, pursuant to the lease, was determined by a percentage of the gasoline delivered, and irrespective of the gallons delivered, College Block was to receive a minimum of $1,000 per month.[2]

---

[1] The original lease was between College Block's predecessor and ARCO's predecessor.

[2] Article 3 of the lease states, in pertinent part, as follows:

"Lessee shall pay as full rental for the premises during the effective term of this lease the following amounts at the following times:

"A sum equal to ONE AND ONE-QUARTER CENTS (1-¼ ¢) per gallon for each gallon of gasoline, irrespective of grade, delivered to the herein described premises; or

On January 1, 1983, 39 months prior to the expiration of the lease, ARCO closed the station. When ARCO ceased operations, it paid College Block $1,000 per month for the months remaining on the lease. ARCO contended that it was responsible only for the minimum monthly rental because the lease did not contain an express covenant requiring it to operate the station. College Block brought suit alleging that ARCO was also responsible for additional sums College Block would have received had the station remained in business. College Block contended that it was entitled to damages because as a matter of law a covenant of continued operation was implied into the lease.[3]

College Block presented its case. There was no evidence presented as to whether, at the time the lease was entered into, the parties considered the $1,000 minimum rent to be a "substantial" minimum. Before ARCO proceeded, the court ruled as a matter of law that there was an implied covenant in the lease which required ARCO to operate a gasoline station for the entire 20-year lease period. Based upon this ruling, the parties subsequently stipulated that had the station been in operation, College Block would have received approximately $3,250 per month.[4] A judgment based on this amount was subsequently entered.

On appeal, ARCO contends that the court erred in concluding that the lease contained an implied covenant of continued operation. After independently evaluating and interpreting the lease (*Eltinge & Graziadio Dev. Co.* v. *Childs* (1975) 49 Cal.App.3d 294, 297 [122 Cal.Rptr. 369]; *Cordonier* v. *Central Shopping Plaza Associates* (1978) 82 Cal.App.3d 991, 1001 [147 Cal.Rptr. 558]), we disagree with ARCO's contention that the language of the lease is ambiguous, but agree that further evidence must be considered before implying the covenant of continued operation into the lease.

## DISCUSSION

■ The issue of whether there is an implied covenant of continued operation arises because the lease did not fix the rent, but guaranteed a

"A sum equal to SIX AND FIVE-TENTHS PER CENT (6.5%) of the gross price . . . of all gasoline delivered to the demised premises; WHICHEVER IS GREATER provided, however, that in no event, and irrespective of the number of gallons of gasoline so delivered, shall Lessor receive less than ONE THOUSAND DOLLARS ($1,000.00) per month for each month during which this lease remains in effect. For fractional monthly periods the minimum guaranteed rental herein specified shall be duly prorated. All rent shall be paid on or about the 20th day of each calendar month following the calendar month in which deliveries are made."

[3] College Block also sued for specific performance and damages for alleged breach of an implied covenant of good faith and fair dealing. These claims were dismissed upon ARCO's motion for nonsuit.

[4] This sum is determined by adding the principal amount of the judgment ($87,696.14) to the $39,000 paid during the 39-month period of time remaining on the lease and dividing the total by 39.

minimum payment plus a percentage based upon the gasoline delivered. In having a percentage lease, the parties contemplated a lengthy association (20 years) during which rents would periodically be established by the market place.

A percentage lease provides a lessor with a hedge against inflation and automatically adjusts the rents if the location becomes more valuable. (Note, *Resolving Disputes Under Percentage Leases* (1967) 51 Minn. L. Rev. 1139; see also Powell on Real Property (1986) § 242[1], pp. 372.15-372.20.) It is advantageous to the lessee if the "location proves undesirable or his enterprise proves unsuccessful." (*Ibid.*) Thus, both parties share in the inherent business risk. (51 Minn. L. Rev., *supra,* at p. 1150, fn. 62.) Inherent within all percentage leases is the fundamental idea that the business must continually operate if it is to be successful. ■ To make a commercial lease mutually profitable when the rent is a minimum plus a percentage, or is based totally on a percentage, a covenant to operate in good faith will be implied into the contract if the minimum rent is not substantial. (*Lippman* v. *Sears, Roebuck & Co.* (1955) 44 Cal.2d 136 [280 P.2d 775].)

In interpreting contracts, "[t]he whole of a contract is to be taken together, so as to give effect to every part . . . each clause helping to interpret the other." (Civ. Code, § 1641.) Further, contracts are to be interpreted so as to make them reasonable without violating the intention of the parties. (Civ. Code, § 1643.) To effectuate the intent of the parties, implied covenants will be found if after examining the contract as a whole it is so obvious that the parties had no reason to state the covenant, the implication arises from the language of the agreement, and there is a legal necessity. (*Lippman, supra,* 44 Cal.2d at p. 142.) A covenant of continued operation can be implied into commercial leases containing percentage rental provisions in order for the lessor to receive that for which the lessor bargained. (*Lippman* v. *Sears, Robeuck & Co., supra; Cordonier* v. *Central Shopping Plaza Associates, supra,* 82 Cal.App.3d 991; cf. *Prins* v. *Van Der Vlugt* (1959) 215 Ore. 682 [337 P.2d 787, 796].)

■ We first examine the lease to determine that to which the parties bargained. The lease between ARCO and College Block required ARCO to build and operate a gasoline service station on the undeveloped property owned by College Block. Other provisions in the lease allowed ARCO to build and maintain any edifices ARCO desired in operating a service station, obligated ARCO to pay all applicable property taxes and insurance, prohibited College Block from conducting a gasoline station on other properties College Block owned or controlled, gave ARCO the right of first

refusal if College Block received an offer to sell the property, and limited ARCO's use of the property to that of the gasoline service station.[5]

In addition, the rent was tied to the operation of the station. The rent provision, an essential part of the lease, did not set a minimum payment irrespective of whether the property was utilized as a service station, but rather "irrespective of the number of gallons . . . delivered." "Without an on-going service station operation, no basis would exist to calculate the rent." (*Continental Oil Co.* v. *Bradley* (1979) 198 Colo. 331 [602 P.2d 1, 2].)[6] The wording of this provision suggests that continued operation of the business was contemplated.

Further, it is incongruent to limit College Block's abilities to lease properties it owned or controlled for use as another gasoline station under the noncompetition clause, thus foreclosing College Block from securing another station if ARCO abandoned the premises, and to limit ARCO's ability to operate any other type of business on the property, yet to conclude that ARCO could cease operations when it desired. Contrary to ARCO's suggestion, the fact that ARCO and not College Block was obligated to build the gasoline service station is not controlling. Both parties were entitled to the expectations as bargained for in the lease.

ARCO's contention that there is no implied covenant of continued operation is based on Article 7 of the lease. ARCO's two arguments based upon this provision have no merit. Article 7 allows ARCO "[a]t any time during the term of this lease . . . [to] remove from said premises any and all buildings, structures, improvements, . . . " ' ARCO argues that "[s]ince it

---

[5] Article 6 of the lease grants ARCO the right and privilege of erecting and maintaining structures for the purpose of operating a gasoline service station. The original draft of the lease contained a provision which would have allowed ARCO to utilize the property for a gasoline station as well as for any lawful purpose. This provision was deleted by the parties. We need not consider the deleted provision to conclude that ARCO was prohibited from utilizing the property for any purpose other than a gasoline station. Even though "a statement as to the purpose for which premises are leased does not imply a covenant by the lessee that he will engage in that use . . . ." (*Lippman* v. *Sears, Roebuck & Co., supra,* 44 Cal.2d at p. 142), here the parties' intent to limit ARCO's use of the property is implicit within the totality of the contract. In examining the contract as a whole, all important provisions refer to a gasoline station. For example, the contract provisions required ARCO to build a station, allowed ARCO the option of cancelling the lease if ARCO could not obtain permits necessary to run the station and determined the amount of rent based upon the number of gallons delivered. To suggest that ARCO could utilize the property for any other purpose would be contrary to the spirit of the entire contract.

[6] ARCO was to construct the station within 120 days. Article 30 provided that in the event construction was not completed within the 120 days, the rent would be $1,000 per month or any fraction of a month to be prorated. This provision was intended to encompass situations in which construction was not timely. It cannot, as ARCO suggests, be utilized to suggest that there was no obligation to continuously operate the station.

is impossible for ARCO to operate a service station while simultaneously exercising its right to remove all buildings and equipment from the leased property" it therefore could cease operating the station at any time as long as College Block was paid the specified minimum rent. ARCO's interpretation of this provision is inconsistent with the spirit of the entire contract. Article 7 is the only contract clause which raises a hint of ambiguity. As shown above, when this provision is viewed in conjunction with all other provisions of the contract, the party's intent becomes evident—ARCO was expected to continually operate a station for the entire length of the lease. (See, e.g., *Lilac Variety, Inc.* v. *Dallas Texas Company* (Tex.Civ.App. 1964) 383 S.W.2d 193, 196.) Article 7 was an obvious recognition that ARCO would need the right to refurbish, replace, and upgrade its station over the 20-year lease period. However, leaving this property idle was not in the contemplation of the parties. ARCO could tear down the gasoline station, replace it, and refurbish it. However, ARCO was still obligated to operate a station for the entire leasehold period.[7]

Article 6 gave ARCO the "right and privilege of erecting . . . structures . . . that it may require or desire to use in operating . . . and conducting . . . business of . . . a gasoline and oil filling and service station . . . ." Relying on *Hicks* v. *Whelan Drug Co.* (1955) 131 Cal.App.2d 110 [280 P.2d 104], ARCO contends that this language did not obligate ARCO to maintain a station, but merely gave it the "privilege" of doing so. In *Hicks* the court held that a tenant who leased property to operate a drug store and in addition had the "privilege" of operating a restaurant or soda fountain within the drug store could not be forced to operate the soda fountain. The court based its ruling on the fact that the soda fountain was an incidental function of the primary purpose of the lease, i.e., the drug store. Unlike *Hicks* and another case relied upon by appellant, *Masciotra* v. *Harlow* (1951) 105 Cal.App.2d 376 [233 P.2d 586], when ARCO closed the gasoline service station it completely frustrated the purpose of the contract. The entire purpose of the lease between College Block and ARCO was to enable ARCO to operate a gasoline station on property owned by College Block. Thus, neither *Hicks* nor *Masciotra* is controlling.[8]

---

[7] ARCO cites three cases from other jurisdictions to support its argument that a removal provision indicates that a lessee may cease operations. *Williams* v. *Safeway Stores, Incorporated* (1967) 198 Kan. 331 [424 P.2d 541] is inapplicable because the case deals with a lessee's right to sublet property. *Stevens* v. *Mobil Oil Corp.* (E.D.Mich. 1976) 412 F. Supp. 809 is inapplicable because a removal clause included in the pertinent lease only mentions the business purpose (gasoline station) in two other places and provides a maximum rental in addition to the guaranteed minimum rental payment. *Stemmler* v. *Moon Jewelry Company* (Fla. 1962) 139 So.2d 150 is inapplicable because it deals with a short lease (five years) and the removal provision relates to fixtures.

[8] We also note that *Hicks* is not applicable because had the soda fountain been operable, the rents would not have increased.

We now turn to whether the $1,000 rent minimum was "substantial." Contracts which determine rents by a percentage of sales inherently contain uncertainties. As discussed above, this type of contract is designed to adjust to the commercial realities of the day by reconciling the rent to the amount of sales. If a business is not profitable, courts are reluctant to force the lessee to continue to operate the business. However, as in all contracts, both parties are entitled to their reasonable expectations at the time the contract was entered into. (Civ. Code, § 1636.) If both parties contemplated continued operations of the business, a covenant of continued operation will be implied into a commercial lease containing a specified minimum plus a percentage when the guaranteed minimum is not substantial or adequate. (*Lippman v. Sears, Roebuck & Co., supra,* 44 Cal.2d at p. 141; see also *Professional Bldg. of Eureka, Inc.* v. *Anita Frocks, Inc, No. 6* (1960) 178 Cal.App.2d 276, 278-279 [2 Cal.Rptr. 914].) In this way, the lessor will receive the benefit of the lessor's bargain.

"A substantial minimum" cannot be precisely defined (*Lippman v. Sears, Roebuck & Co., supra,* 44 Cal.2d at p. 145) and factual information on this issue must be examined before a covenant will be implied. (*Ibid.; Professional Bldg. of Eureka, Inc.* v. *Anita Frocks, Inc., No. 6, supra,* 178 Cal.App.2d at pp. 278-279.) By evaluating the facts surrounding the formulation of the contract, the courts determine if the specified sum provides the lessor with what was reasonably expected. (See, e.g., *Masciotra* v. *Harlow, supra,* 105 Cal.App.2d 376.)

Here, the court erred by ruling that there was an implied covenant of continued operation in the lease prior to receiving evidence on this factual issue.[9] The lease between ARCO and College Block was executed approximately 17 years prior to the cessation of operations. In the interim, great changes in property values, gasoline prices, and the amount of sales could have occurred. Before finding, as a matter of law, that a covenant of continued operation will be implied, the trier of fact must find that the $1,000, the guaranteed minimum, was not substantial and did not provide College Block with a fair return on its investment. The parties should be given an opportunity to submit evidence as to the facts and circumstances surrounding the contract to determine if, at the time the contract was entered into, the guaranteed rent was "substantial." (See, e.g., *Professional Bldg. of Eureka, Inc.* v. *Anita Frocks, Inc., No. 6, supra,* 178

---

[9] The parties stipulated to the amount of damages based upon the difference between the guaranteed monthly rentals paid by ARCO and the lease formula. If it is appropriate to imply a covenant, the proper measure of damages is the amount College Block would have earned had the service station been operational and had been used in its usual and customary manner. (*Lippman, supra,* 44 Cal.2d at p. 146.)

Cal.App.2d 276.) We remand to the trial court so evidence may be heard on this issue.

The judgment is reversed and the matter remanded with directions to proceed in accordance with the views expressed herein. The parties are to bear their own costs on appeal.

Boren, J., concurred.