BVT LEBANON SHOPPING    )
CENTER, LTD., a Tennessee Limited   )
Partnership,    )
   )
     Plaintiff/Appellee,    )    Appeal No.
   )    01-A-01-9710-CV-00607
v.    )
   )    Wilson Circuit
WAL-MART STORES, INC., a    )    No. 9113
corporation; and KUHN'S-BIG-K    )
STORES CORP., a Tennessee    )
corporation,    )
   )
     Defendants/Appellants.    )

**FILED**

April 23, 1999

Cecil Crowson, Jr.
Appellate Court Clerk

## COURT OF APPEALS OF TENNESSEE

### APPEAL FROM THE WILSON COUNTY CIRCUIT COURT
### AT LEBANON, TENNESSEE

### THE HONORABLE BOBBY CAPERS, JUDGE

THOMAS V. WHITE
KENNETH F. SCOTT
Tune, Entrekin & White, P.C.
21st Floor, First American Center
315 Deaderick Street
Nashville, Tennessee 37238
     ATTORNEYS FOR PLAINTIFF/APPELLEE


JON B. COMSTOCK
702 S.W. 8th Street
Bentonville, Arkansas 72716

THOMAS W. LAWRENCE, JR.
Parker, Lawrence, Cantrell & Dean
200 Fourth Avenue North
Fifth Floor
Nashville, Tennessee 37219

NEAL AGEE, JR.
Agee, Agee & Lannom
P. O. Box 649
Lebanon, Tennessee 37088-0649
     ATTORNEYS FOR DEFENDANTS/APPELLANTS

AFFIRMED AS MODIFIED,
AND REMANDED

WILLIAM B. CAIN, JUDGE

# O P I N I O N

This is a suit by a limited partnership as owner of a shopping center in Lebanon, Tennessee against Wal-Mart Stores, Inc. alleging breach of a lease contract.

In 1968, J.R. Freeman, Trustee as lessor, entered into a lease agreement with Kuhn Brothers Co., Inc. as lessee of certain premises in a commercial shopping center known as The Center of Lebanon. This lease was to expire in 1984. The lease provided a guaranteed minimum annual rent of $70,000.00, together with 2 ½% of all gross receipts over $2,333,000.00 per annum.

Wal-Mart acquired Kuhns and the 1968 lease agreement was amended in 1981 with Freeman, Trustee still as landlord and Wal-Mart as lessee. In this 1981 amendment to the lease the term thereof was extended from 1984 through 1996. The guaranteed minimum rent was increased from $70,000.00 per annum to $136,000.00 per annum with gross receipts percentage rent declining incrementally with increased gross receipts. The permitted "use" was changed from a "retail promotional type store" to a "discount department store."

BVT acquired The Center of Lebanon from Freeman Trustee, and in 1985 Wal-Mart determined a need to expand the leased premises. This resulted in a 1985 amendment to the lease whereby the size of Wal-Mart's premises was to be expanded from 50,000 square feet to 84,000 square feet with the cost of such expansion to be borne by BVT. This necessitated the purchase of additional real estate and the buyout by BVT of the Foodtown lease which was adjacent to the existing Wal-Mart premises. Wal-Mart supplied the plot plans and specifications for the expansion and BVT paid approximately $1,500,000.00 to complete the Wal-Mart expansion.

The 1985 lease amendment extended the term of the lease for nine additional years to 2005. The guaranteed minimum rent was changed from $136,000.00 annually to $272,000.00 with an incremental reduction in percentage of gross receipts rental tied to increased gross receipts of Wal-Mart.

Wal-Mart was quite successful at The Center of Lebanon. By 1994, the gross-receipts percentage rental by Wal-Mart to BVT comprised approximately 37% of the total rent paid annually.

In 1994, Wal-Mart determined to vacate The Center of Lebanon and relocate to a new super center to be constructed within a short distance of the demised premises. Negotiations between BVT and Wal-Mart failed, and BVT filed suit October 6, 1994 in anticipatory breach of contract.

On May 24, 1995, over the objections of BVT, Wal-Mart ceased operations and vacated The Center of Lebanon premises, continuing to pay the $272,000 annual minimum rent. Five months later it opened a "Bud's Discount City" in the space vacated by Wal-Mart. "Bud's Discount City" is wholly owned by Wal-Mart and had generated from two to three million dollars in gross receipts per annum at the time of the trial of this case.

BVT asserts that Wal-Mart breached the express "use" clause of the lease and an implied covenant of continuous occupancy. Non-jury trial in April, 1997 resulted in an August 27, 1997 judgment in favor of BVT for compensatory damages in the amount of $2,507,674.00, together with $108,759 plus interest for failure to include third party receipts, attorney fees, sanctions and costs. The trial court found breach of the express "use" covenant and breach of an implied covenant of continuous occupancy. From this judgment Wal-Mart has appealed. BVT asserts error as to the amount of damages awarded.

## I. PROCEEDINGS IN THE TRIAL COURT

This court marks with empathetic chagrin the acrimonious and heated nature of the proceedings below. Wal-Mart complains with considerable justification that the findings of fact and conclusions of law contained in the August 27, 1997 order are inconsistent with findings announced by the court at various stages of the trial and appearing in the evidentiary transcript. Because of these inconsistencies, Wal-Mart urges in its brief that the findings of fact and conclusions of law in the August 27, 1997 order should be disregarded by this court. The law of Tennessee, however, is well settled to the contrary.

Cases predating the Tennessee Rules of Civil Procedure left no room for doubt on this point, and as this court has observed:

> A judgment must be reduced to writing in order to be valid. It is inchoate, and has no force whatever, until it has been reduced to writing and entered on the minutes of the court, and is completely within the power of the judge or Chancellor. A judge may modify, reverse, or make any other change in his judgment that he may deem proper, until it is entered on the minutes, and he may then change, modify, vacate or amend it during that term, unless the term continues longer than thirty days after the entry of the judgment, and then until the end of the thirty days.

*Broadway Motor Co., Inc. v. Fire Insurance Co.*, 12 Tenn. App. 278, 280 (1930).

This rule survived the adoption of the Tennessee Rules of Civil Procedure. *Sparkle Laundry and Cleaners, Inc. v. Kelton*, 595 S.W.2d 88, 93 (Tenn. App. 1979); *Evans v. Perkey*, 647 S.W.2d 636, 641 (Tenn. App. 1982).

As observed by the Court of Appeals for the Western Section: "We do not review the court's oral statements, unless incorporated in a decree, but review the court's order and judgments for that is how a Court speaks." *Shelby v. Shelby*, 696 S.W.2d 360, 361 (Tenn. App. 1985).

The proposed findings of fact and conclusions of law and the order of August 27, 1997, were prepared by the attorney for the plaintiff and adopted by the court. Prior to the adoption of the Tennessee Rules of Civil Procedure, this procedure was an improper action and reversible error. *Nashville, Chattanooga and St. Louis Railway Co., et al v. Price*, 125 Tenn. 646, 148 S.W. 219 (Tenn. 1911).

The adoption of Rule 52 of the Tennessee Rules of Civil Procedure modified *Price* and the supreme court has held:

> Although we believe *Price* was correctly decided, we think the adoption of the Rules of Civil Procedure calls for modification of its holding. We agree that the preparation of findings and conclusions is a high judicial function. We are committed to the requirement that the trial court's findings and conclusions be its own. However, we are also aware that the thorough preparation of suggested findings and conclusions by able counsel can be of great assistance to the trial court. In an effort to strike a balance between

these considerations, we hold that although it is improper for the trial court to require counsel to prepare findings, it is permissible and indeed sometimes desirable for the trial court to permit counsel for any party to submit proposed findings and conclusions. Findings prepared by the trial judge which represent his independent labor are preferable, however we do not disapprove of party-prepared findings. This is a modification of *Price* which we feel is more consonant with the Rules of Civil Procedure. We wish to point out that before adopting findings prepared by counsel, the trial judge should carefully examine them to establish that they accurately reflect his views and conclusions, and not those of counsel. He should also ascertain that they adequately dispose of all material issues, and to assure that matters not a proper part of the determination have not been included.

*Delevan-Delta Corp. v. Roberts*, 611 S.W.2d 51, 52-3 (Tenn. 1981).

The order in this case prepared by counsel for the plaintiff was the subject of extensive discussion between counsel and the court before it was entered. At the end of this discussion counsel for the defendant attempted to have the court enter a simple order granting judgment without findings of fact or conclusions of law. The record reflects:

THE COURT: Now, what else, sir?

MR. AGEE: That's all on their proposed order, Your Honor. I would tender to the Court a draft order that I would give to the Court which --

MR. WHITE: Judge, we've never seen it.

THE COURT: All right.

MR. COMSTOCK: That's correct. But it's a very simple order, and what it really does is [is] it allows all the findings that the Court has made on the record to be the Court's findings, and it allows the order to simply reflect the ultimate decisions that are being made.

THE COURT: Let me suggest this to you: I like Mr. White's order fine because everybody wanted the findings of the facts and all of these other issues. That's what you wanted the Court to do, make specific findings of fact, and that's exactly what you sat here and asked me as relates to this order today that I specifically make that finding of fact and all these other things. And I've addressed that issue, and they are in there. And you have originally requested that, and I'm going to hold you to that request. So Mr. White's order properly reflects what's been requested by the defendant in this matter. So for that reason, I'm more inclined to accept Mr. White's order, to be an order, and it also reflects the findings of fact by the Court. Now, what else?

MR. COMSTOCK: May I on my original simply put "Wal-Mart draft," and then file that with the clerk?

THE COURT: You certainly may. Okay. Now --
MR. COMSTOCK: Your Honor, that's all on that.
THE COURT: All right. Well, then the Court is going to sign the order.

This court recognizes the marked discrepency between the written findings of fact and the trial court's oral findings throughout the transcript. Although puzzling in result, the only conclusion to be drawn from the difference is that, for whatever reason, the court below changed its mind.

Under the foregoing rules, the findings of fact and conclusions of law reflected by the order of August 27, 1997 are the only findings of fact and conclusions of law of the trial court. They alone are reviewable on appeal under Rule 13(d) of the Rules of Appellate Procedure with a presumption of correctness unless the evidence preponderates to the contrary. *Foster v. Bue*, 749 S.W.2d 736 (Tenn. 1988).

The conclusions of law drawn by the trial court are reviewable de novo on appeal without presumption of correctness. *Tennessee Farmers Mutual Ins. Co. v. Moore*, 958 S.W.2d 759 (Tenn. App. 1997).

The findings of fact and conclusions of law of the trial court reflected by the order of August 27, 1997 are:

(a)     The lease at issue contains a percentage rent clause and the intent of the parties at the time the lease was executed was that both base rent and percentage rents would be realized during the term of the lease; be it provided by the existing "Wal-Mart" discount department store, another discount department store, or any other lawful use acceptable to the landlord that would generate the same amount of percentage rent income that was capable of being generated by the "Wal-Mart" discount department store that ceased to operate in the demised premises.

(b)     The premises were expanded at Wal-Mart's request and according to Wal-Mart's plans as reflected in the 1985 Lease Amendment. Although the 1985 Amendment extended the lease term to twenty years, the increase in base rent alone would not have amortized the cost of the expansion over the twenty years.

(c)     The plaintiff would not have made the expenditures of approximately $1.5 million to expand the premises except in

contemplation of receiving a percentage of sales in addition to base rents.

(d) Bud's is not a "discount department store" as contemplated by the parties at the time they entered into the lease. Therefore, Bud's does not meet the requirements of the lease. The Court bases this conclusion in part upon Wal-Mart's own admissions in its letters, communications and advertising both by flyer and on the Internet.

(e) Gross sales in the demised premises increased each year from 1981, the first year Wal-Mart, Inc. operated its "Wal-Mart" discount department store in the premises until FYE January 31, 1995, the last full year that Wal-Mart operated its "Wal-Mart" discount department store in the demised premises. Although the threshold for percentage rent was increased from $6.825 million to $18.133 million, contemporaneous with the 1985 Amendment and expansion, gross sales again exceeded the $18.133 million threshold within two years after the expansion in 1986. Percentage rents were generated starting in FYE 1988 and increased every year thereafter including FYE January 31, 1995.

(f) "Discount Department Store" is a business term used in the retail industry which the Court has no independent qualification to define. However, the Court finds that the parties contemplated a definition more specific than the broad combination of the definitions of "discount" and "department" found in Webster's Dictionary. The Court further finds that the parties contemplated that a "Discount Department Store" would posses[s] the characteristics offered by plaintiff's expert, Wayne Tomlinson and, therefore, adopts the following definition: "a large, high-volume merchandising establishment that (I) presents an accurate image to the consumer that it is a discount department store, (ii) sells basically the same type new high quality soft and hard goods day in and day out, (iii) sells at a discount and at a minimal markup, and (iv) is open to the public seven days a week (usually 9 a.m. to 9 p.m. six days and Noon to 5 p.m. on Sundays." Large would mean approximately 10,000 square feet and larger and high volume, would mean annual sales greater than 5 times its inventory value. (Typically between 150-400/Square foot using 1995 published data). It is a store that carries the same type quality new goods from week to week and is open typically seven days a week, in some instances twenty four hours a day.

(g) Except for the square footage, the Bud's at Lebanon does not meet any of the criteria of a "discount department store" as contemplated by the parties.

(h) No retail sales were conducted from the premises for a period of four months when the "Wal-Mart" discount department

store ceased operations until the "Bud's" operation began.

(i)     Defendants have provided plaintiff with multiple and conflicting reports of gross sales, some years including third-party drug sales and some years excluding third-party drug sales.

(j)     It was necessary for the plaintiff/lessor to employ counsel and otherwise incur expenses in connection with defendants anticipatory breach and subsequent actions regarding the demised premises and the subject lease.

2.     The Court makes the following conclusions of law:

(a)     This is a contract construction case and the Court has to determine the intent of the parties at the time the contract was entered into from the entire contract and construe the contract such that its terms are in harmony with each other.

(b)     The Bud's operating in the demised premises is not a "discount department store" as required under the subject lease, and, therefore, the defendants have breached the "use" clause of the subject lease.

(c)     There is an implied covenant by the defendants to continuously operate either a discount department store, as contemplated by the parties in 1985 and as previously described in this order, or any other lawful business that would make reasonable commercial sense for the plaintiff to accept. The Court further finds that the defendants have breached this covenant and that it would be reasonable for the landlord to withhold consent for the operation of a Bud's as a replacement tenant.

(d)     The defendants have improperly withheld percentage rent attributable to third-party sales conducted within the demised premises. Furthermore, defendants failed to disclose to plaintiff that they changed their position relative to these third-party sales at some time after the 85 amendment.

(e)     Defendants have admitted, pursuant to Kandy Beaver's affidavit and deposition that they have erroneously deducted certain items in addition to third-party gross sales from gross receipts when reporting and paying percentage rents.

(f)     The plaintiff has been damaged as a result of the defendants' breaches of the lease.

(g)     Per the lease and pursuant to the Court's inherent authority, given the circumstances of this case regarding the withholding of accurate gross receipt information by defendants, the plaintiff is entitled to audit the defendants' records to determine the amount of gross receipts from the demised premises; including

third-party drug sales and otherwise, to ascertain the amount of percentage rent that should have been paid plaintiff from 1985 to present.

(h) Pursuant to the lease, Plaintiff is entitled to attorneys' fees and expenses.

Based upon the foregoing findings of fact and conclusions of law the trial court entered a compensatory damage award in the amount of $2,507,674.00, representing the present value of lost future percentage rents for the duration of the lease.

The August 27, 1997 order further provided:

5. By previous Order, this Court granted the plaintiff's motion for partial summary judgment on the issue of the defendants' failure to include gross receipts (and to pay the plaintiff their respective part of these gross receipts) of third-party tenants, and, based upon statements of counsel for both parties, a review of the file, and the testimony before this Court, this Court grants an award of $108,759.00 plus interest at 10 percent through 1/31/97, for a total of $144,689.75 plus $39.64 per diem for every day thereafter until paid. This award is primarily based upon the Court's acceptance of the testimony of Sam Boles, the witness for the plaintiff with respect to the calculation of these monies and the interest on these monies from January 1 of each of the years referenced in trial Exhibit B, which is attached to this Order and incorporated herein by reference. The Court further awards attorneys' fees in the amount of $10,125.00 (67.5 hours at $150/hr.) plus expenses in the amount of $828.75, for a total of $10,953.75.

By supplemental order entered September 9, 1997 plaintiff was awarded attorneys' fees in the amount of $170,042.61 for the period through June 30, 1997 and sanctions against defendant Wal-Mart in the amount of $6,240.00, representing fees due to auditors for work done in Bentonville, Arkansas.

II. ISSUES ON APPEAL

The first issue on appeal asserted by Wal-Mart is its proposition number one that "Wal-Mart's act of ceasing its 'Wal-Mart Discount Store' operation, and commencing its 'Bud's Discount City' operation is not a breach of any express or implied term of the contract."

This issue comprises the heart of this case. The trial court has held: 1)

'Bud's Discount City' is not a 'discount department store' within the meaning of the 'use' clause of the lease agreement and, 2) Wal-Mart breached an implied covenant of continuous occupancy under the lease.

Generally the law recognizes two distinct types of implied contracts: contracts implied in fact and contracts implied in law, commonly referred to as quasi contracts. *Paschall's, Inc. v. Dozier*, 407 S.W.2d 150, 153 (Tenn. 1966).

The differences between contracts implied in fact and contracts implied in law was delineated by the court of appeals in the context of a phosphate mineral lease in *Weatherly v. American Agricultural Chemical Co.*, 65 S.W.2d 592 (Tenn. App. 1933). The court observed:

> In none of these provisions was the defendant expressly obligated to mine and remove from the complainants' premises all of the specified mineral within the term of twenty years. Contracts implied in fact arise under circumstances which, according to the ordinary course of dealing and the common understanding of men, show a mutual intention to contract. Such an agreement may result as a legal inference from the facts and circumstances of the case. 6 R. C. L. 587; 13 C. J. 241. "Contracts implied in law, or more properly quasi or constructive contracts, are a class of obligations which are imposed or created by law without the assent of the party bound, on the ground that they are dictated by reason and justice and which are allowed to be enforced by an action ex contractu." 13 C. J. 244. With these definitions in mind, we must determine whether or not such an agreement as is insisted upon was implied.

> The doctrine of duty upon the lessee of minerals to develop the leased premises to the mutual profit of himself and the lessor by exercising reasonable diligence has been applied in many cases upon the theory of implied contract and upon principles of equity and justice; but the court can declare implied covenants to exist only when there is a satisfactory basis in the express contract of the parties which makes it necessary to imply certain duties and obligations in order to effect the purposes of the parties to the contract made. And before a covenant will be implied in the express terms of a contract, or in view of the customs and practices of the business to which the contract relates, it must appear therefrom that it was so clearly in the contemplation of the parties that they deemed it unnecessary to express it, or that it is necessary to imply such covenant in order to give effect to the purpose of the contract as a whole.

*Weatherly v. American Agricultural Chemical Co.*, 65 S.W.2d 592, 598 (Tenn.

App. 1933).

These general rules provide the parameters within which the question of the existence or nonexistence of an implied covenant of continuous occupancy must be determined.

It is well to observe at the outset that although the lease documents in issue did contain "use" clauses, none contained express covenants of continued occupancy. Nor is the lessor attempting a right of re-entry pursuant to the use clause as such right is incorporated into the 1968 lease and both the 1981 and 1985 amendments. Since Wal-Mart is continuing to pay the $272,000.00 per annum "minimum rent" set by the 1985 amendment, it matters little whether "Bud's Discount City" is an operation in violation of the "use" clause of the lease in the absence of an implied covenant of continuous occupancy. By the express terms of the lease as amended, there is no prohibition against Wal-Mart vacating the premises in its entirety, thus producing no gross receipts at all. Wal-Mart would, of course, be obligated under the terms of the 1985 amendment to continue paying the $272,000.00 per year rental through the end of the term of the lease in 2005. The case thus turns on whether or not there is an implied covenant of continuous occupancy as found by the trial court and whether or not "Bud's Discount City" qualifies as a tenant under such an implied covenant.

This inquiry begins with *Kroger v. Chemical Securities Co.*, 526 S.W.2d 468 (Tenn. 1975).

In *Kroger*, the Tennessee Supreme Court correctly noted the general disfavor accorded to such implied covenants, saying:

> . . . such implied covenants must arise from the terms of the lease itself.
>
> One clause which might, arguably, support such covenants is the percentage rental clause. However the Court of Appeals did not rely on this provision in reaching its conclusion, and considering the substantial sum set as the base rental and the small and speculative nature of the override, we likewise do not find that clause determinative.

*Kroger Co. v. Chemical Securities Co.*, 526 S.W.2d 468, 471-72 (Tenn. 1975). First and foremost among circumstances supporting the implied covenant is a percentage rental clause such as exists in the case at bar. The *Kroger* court recognized but distinguished *Slidell Investment Co., Inc. v. City Product Corp.,* 202 S.2d 323 (La. App. 1967) involving a substantial percentage override of the "minimum rent" under the lease.

We begin this discussion by stating that: ". . . The decision whether to imply a covenant of continuous operation must be evaluated at the time the parties signed the agreement." *Nalle v. Taco Bell Corp.*, 914 S.W.2d 685, 688 (Tex. App. 1996). The critical time is June of 1985 when the parties executed the "third amendment to lease".

In this 1985 amendment,

(1)     BVT agreed at the request of the Wal-Mart to expand the Wal-Mart premises from 50,000 to 84,000 square feet. This was accomplished at a cost to the BVT of approximately $1,500,000.00.

(2)     The Wal-Mart agreed to operate a "discount department store" on the premises.

(3)     The term of the lease was extended for an additional nine years to expire January 31, 2005.

(4)     The "fixed annual minimum rent" was increased from $136,000.00 to $272,000.00.

(5)     The percentage rent was set at one and one-half percent of gross receipts in excess of $18,133,333.00 to and including $20,000,000.00 in gross receipts and thereafter one percent of gross receipts in excess of $20,000,000.00.

The Court of Appeals of Idaho stated in synopsis the rules applicable to lease provisions similar to the one agreed to by BVT and Wal-Mart.

> [5]     The major prerequisite for a finding of an implied covenant in a percentage rental agreement is that the stipulated minimum rental must not be substantial consideration. *See Archer v. Mountain Fuel Supply Co.*, supra, 102 Idaho at --- - ---, 642 P.2d 943; *Professional Building of Eureka v. Anita Frocks, Inc.*, 178 Cal.App.2d 276, 2 Cal.Rptr. 914 (1960); *Lippman v. Sears Roebuck & Co.*, 44 Cal.2d 136, 280 P.2d 775 (1955); *Masciotra v. Harlow*,

105 Cal.App.3d 376, 233 P.2d 586 (1951); *Kroger v. Bonny Corp.*, supra; *Stop & Shop, Inc. v. Ganem*, 347 Mass. 697, 200 N.E.2d 248 (1964); *PBJ Company, Inc. v. Ben Duthler, Inc.*, 89 Mich.App. 767, 282 N.W.2d 216 (1979); *Bobenal Investment Inc. v. Giant Super Markets, Inc.*, 79 Mich.App. 31, 260 N.W.2d 915 (1977); *Crestwood Plaza, Inc. v. Kroger Co.*, 520 S.W.2d 93 (Mo.App.1974); *Kretch v. Stark,* 193 N.E.2d 307 (Ohio Com.Pl.1962); *Brown v. Safeway*, supra. Parol evidence is properly admitted to determine whether minimum rentals are substantial. *Werry v. Phillips Petroleum Co.*, 97 Idaho 130, 135, 540 P.2d 792, 797 (1975); *Anita Frocks, Inc.*, 178 Ca.App.2d at 278-79, 2 Cal.Rptr. at 916; *Lippman*, 280 P.2d at 780- 81; *PBJ Company*, 282 N.W.2d at 218. The burden of showing a disparity between the fixed minimum rent and fair rental value sufficient to furnish grounds for implying a covenant is on the lessor. *Stop & Shop Inc.*, 200 N.E.2d at 252.

*Bastian v. Albertson's, Inc.*, 643 P.2d 1079, 1082-1083 (Idaho 1982).

We must first determine whether or not the $272,000.00 per year is "substantial consideration."

At the time of the June, 1985 amendment to the lease, all parties were aware of the prior history of percentage rental experience under the lease.

| Fiscal Year | Adjusted Sales | Base | Percent | Amount Paid |
|---|---|---|---|---|
| 1981 | | | | |
| 1982 | 2,047,072.56 | 1,361,110.00 | 2.50% | 17,149.06 |
| 1983 | 4,931,115.09 | 6,825,000.00 | 2.00% | |
| 1984 | 7,539,155.97 | 6,825,000.00 | 2.00% | 14,283.12 |
| 1985 | 8,981,538.49 | 6,825,000.00 | 2.00% | 43,130.77 |

Thus is reflected the continued growth of Wal-Mart sales and corresponding percentage rent payments to the lessor prior to the June, 1985 amendment to the lease. Percentage rentals during this period increased from $17,149.06 in 1982 to $43,130.77 in 1985. Gross sales increased four fold from 1982 through 1985.

The 1985 amendment to the lease which increased the base rental from $136,000.00 to $272,000.00 corresponded with the increased base sales that would be required before any percentage rent would be paid to the lessor after the expansion.

From 1986 to 1990, Wal-Mart's adjusted gross sales did not exceed the amount required to trigger percentage rent. However, the minimum amount was triggered by the adjusted gross sales in 1990. The 1990 through 1995 experience shows:

| Fiscal Year | Adjusted Sales | Base | Percent | Amount Paid |
|---|---|---|---|---|
| 1990 | 19,485,627.52 | 18,133,333.00 | 1.50% | 20,284.41 |
| 1990 Total | | | | 20,284.41 |
| 1991 | 20,524,449.94 | 18,133,333.00 | 1.50% | 28,000.00 |
| 1991 | | 20,000,000.00 | 1.00% | 5,244.49 |
| 1991 Total | | | | 33,244.49 |
| 1992 | 22,409,535.46 | 18,133,333.00 | 1.50% | 28,000.00 |
| 1992 | | 20,000,000.00 | 1.00% | 24,095.36 |
| 1992 Total | | | | 52,095.36 |
| 1993 | 25,376,102.00 | 18,133,333.00 | 1.50% | 28,000.00 |
| 1993 | | 20,000,000.00 | 1.00% | 53,761.02 |
| 1993 Total | | | | 81,761.02 |
| 1994 | 26,298,243.00 | 18,133,333.00 | 1.50% | 28,000.00 |
| 1994 | | 20,000,000.00 | 1.00% | 62,982.43 |
| 1994 Total | | | | 90,982.43 |
| 1995 | 29,551,354.91 | 18,133,333.00 | 1.50% | 28,000.00 |
| 1995 | | 20,000,000.00 | 1.00% | 95,513.55 |
| 1995 Total | | | | 123,513.55 |

The term "fixed annual minimum rent" used in the 1985 amendment to describe the $272,000.00 per annum base rental has no fixed legal meaning. As the Supreme Court of California has held:

> The term "minimum monthly payments" has no fixed legal significance; its meaning can be ascertained only by reference to the circumstances in which the lease was executed. Extrinsic evidence, therefore, was properly admitted to show those circumstances.

> Sears maintains that the evidence does not support the finding that $285 per month "was intended to be and was, in fact, a nominal rental and was not a substantial or adequate minimum rental."

> Ordinarily, when used in connection with monetary obligations, the word "nominal" denotes "a trifling sum" (Black's Law Dic. 4th Ed. 1951, p. 469), and Sears is correct in the contention that more than that amount was required by the lease. But a finding that, within the contemplation of the parties, $285 per month was not a substantial and adequate minimum rent to be paid in lieu of a percentage of the sales is a sufficient basis for a determination that Sears impliedly covenanted to use the demised premises for the sale of merchandise during the entire term of the lease. It was not necessary that the trial court go farther, and the characterization of the minimum rent as nominal is superfluous.

*Lippman v. Sears Roebuck & Co.*, 280 P.2d 775, 780-781 (Cal. 1955).

The "substantial-insubstantial" question is tied closely to market value in the law governing implied covenants of continuous occupancy.

> The plaintiff contends that notwithstanding the interest of the lessors in having the premises operated so as to give it the benefit of possible percentage rent, the absence of an express requirement to operate together with a more than nominal minimum rent exclude the implication of a covenant to continue operations.
>
> This may state too broad a rule. For even if there is a more than nominal minimum rent, other circumstances such as that the fixed rent is significantly below the fair rental value of the property might justify the conclusion that the parties intended that the lessors have the benefit of the percentage rent throughout the term.

*Stop & Shop, Inc. v. Ganem*, 200 N.E.2d 248, 251 (Mass. 1964).

The evidence in this case indicates that the $272,000.00 per annum minimum rent was well below the fair market rental in Lebanon and the surrounding areas at the time the parties agreed to the 1985 amendment. Converted to square foot rental the base rent paid by Wal-Mart in this case was $3.40 per square foot. The proof showed that the market value in Lebanon and the surrounding areas ranged from $4.59 to $5.40 per square foot. The record further shows that the $136,000.00 per annum increase in the base rent standing alone would be insufficient to amortize the $1,500,000.00 cost of expansion of the Wal-Mart leased property which expansion was accomplished at the request of Wal-Mart and paid for by BVT.

In *First American Bank & Trust Co. v. Safeway Stores, Inc.*, 729 P.2d 938

(Ariz. App. 1986), the trial court made the following pertinent findings of fact:

> The trial court found that the four gentlemen who negotiated the lease on behalf of Betz were experienced shopping center developers. It also made the following pertinent findings of fact:

> > 16. The base rent of $1.46 per square foot per year was not in itself a fair, adequate, or market rent when the lease was made.

> > 17. Defendant has continued to pay the base rent, which amounts to $2,500 per month, but has generated and paid no percentage rents for the period from December 24, 1983, to date.

> > * * *

> > 19. A covenant of continuous operation arises from and is implied by the language and the provisions of the lease, particularly the clauses providing for percentage rent, requiring the landlord to build to suit as a grocery store (paragraph 5), and restricting competition in the shopping center (paragraph 14) and on adjacent property (paragraph 29) and it appears from the language of the lease that Defendant's continuous operation was so clearly within the contemplation of the parties that they deemed it unnecessary to express it.

> > 20. The subject of continuous operation was never discussed between the parties and is not completely covered by the lease. A covenant of continuous operation would have been made or required by the landlord if attention had been called to it. . . .

729 P.2d 938, 940.

The *Safeway* court, adopting the same factors to be considered on the question of implied covenants of continuous operations relied upon by *Lippman v. Sears Roebuck Co.*, 280 P.2d 775, 779 (Cal. 1955), stated the following:

> (1) the implication must arise from the language used ...; (2) it must appear from the language used that it was so clearly within the contemplation of the parties that they deemed it unnecessary to express it; (3) implied covenants can only be justified on the grounds of legal necessity; (4) a promise can be implied only where it can be rightfully assumed that it would have been made if attention had been called to it; (5) there can be no implied covenant where the subject is completely covered by the contract.

*Safeway*, 729 P.2d 938, 940 (Ariz. App. 1986).

With these factors in mind the *Safeway* court concluded:

Safeway contends that the testimony of Betz' expert appraisal witness does not support the trial court's conclusion that the base rent was inadequate and that the provision of the lease allowing Safeway to assign the lease precludes the trial court from finding the existence of an implied covenant of continuous operation. We do not agree. The expert witness unequivocally testified that the base rent was not equal to the fair rental value of the premises leased to Safeway. He testified that the percentage clause of the lease had to be considered in calculating the fair rental value of the property and, absent the percentage provisions, the monthly minimum rental was not sufficient to satisfy the obligations that the landlord would incur in financing the construction and development of the property.

The court found that there was no incongruity between paragraph 13 of the lease, which allowed Safeway to sublet and assign the lease, and an implied covenant of continuous operation. Safeway argues that an implied covenant of continuous operation is repugnant to the provision of the lease allowing it to assign the entire lease. On that issue, we agree with the conclusion of law made by the trial court:

The presence of a right to assign or sublet is not necessarily inconsistent with an implied covenant of continuous operation. The two covenants can be harmonized to permit subletting or assignment to a business of the same character.

*Safeway*, 729 P.2d 938, 940-41 (Ariz. App. 1986).

The "risk sharing factor" inherent in a percentage rental lease is a part of the consideration mutually agreed to between the parties:

The issue of whether there is an implied covenant of continued operation arises because the lease did not fix the rent, but guaranteed a minimum payment plus a percentage based upon the gasoline delivered. In having a percentage lease, the parties contemplated a lengthy association (20 years) during which rents would periodically be established by the market place.

A percentage lease provides a lessor with a hedge against inflation and automatically adjusts the rents if the location becomes more valuable. (*Resolving Disputes Under Percentage Leases* (1967) 51 Minn.L.R. 1139, 1139; see also *Powell on Real Property*

(1986) vol. 2, § 242[1], pp. 372.15-372.20.) It is advantageous to the lessee if the "location proves undesirable or his enterprise proves unsuccessful." (*Id.*) Thus, both parties share in the inherent business risk. (51 Minn.L.R., *supra*, at p. 1150, fn. 62.) Inherent within all percentage leases is the fundamental idea that the business must continually operate if it is to be successful. To make a commercial lease mutually profitable when the rent is a minimum plus a percentage, or is based totally on a percentage, a covenant to operate in good faith will be implied into the contract if the minimum rent is not substantial. (*Lippman v. Sears, Roebuck & Co.* (1955) 44 Cal.2d 136, 280 P.2d 775.)

In interpreting contracts, "[t]he whole of a contract is to be taken together, so as to give effect to every part . . . each clause helping to interpret the other." (Civ.Code, § 1641.) Further, contracts are to be interpreted so as to make them reasonable without violating the intention of the parties. (Civ.Code, § 1643.) To effectuate the intent of the parties, implied covenants will be found if after examining the contract as a whole it is so obvious that the parties had no reason to state the covenant, the implication arises from the language of the agreement, and there is a legal necessity. (*Lippman, supra*, 44 Cal.2d at p. 142, 280 P.2d 775.) A covenant of continued operation can be implied into commercial leases containing percentage rental provisions in order for the lessor to receive that for which the lessor bargained.

*College Block v. Atlantic Richfield Co.*, 254 Cal.Rptr. 179, 182 (Cal. App. 2d 1988).

Of similar import though in the context of summary judgment is *Leeds v. Alpha Beta Co.*, 75 Cal.Rptr.2d 162 (Cal. 1998) wherein the court holds:

The lease required the property owner to build a supermarket pursuant to Alpha Beta's design. The parties agreed to a long term lease during which the rent was primarily based on a percentage of sales. Moreover, as the anchor tenant, Alpha Beta's continued business operation was important in ways other than its increased rental payments. Abandonment of the premises could certainly be found to deny the landlord the benefit of its bargain.

75 Cal.Rptr.2d 162, 164 (Cal. 1998).

The United States District Court for the Eastern District of Kentucky in *Lagrew, et al v. Hooks-SupeRx, Inc.*, further refined the *Bastian* factors:

To determine whether to imply a covenant of continuous operation, the courts look to the terms of the lease and the surrounding circumstances. Generally, the courts take several

factors into account: (1) whether base rent is below market value, (2) whether percentage payments are substantial in relation to base rent, (3) whether the term of the lease is lengthy, (4) whether the tenant may sublet, (5) whether the tenant has rights to fixtures, and (6) whether the lease contains a noncompetitive provision.

*Lagrew, et al v. Hooks SupeRx, Inc.*, 905 F.Supp. 401, 405 (E.D. Ky. 1995).

These factors were recently applied by the Appellate Court of Connecticut in *Pequot Spring Water Co. v. Brunelle, et al*, 698 A.2d 920 (Conn. App. Ct. 1997) in declaring the existence of an implied covenant of continuous operations. The Supreme Court of Connecticut granted an application to appeal in the *Brunelle* case on September 30, 1997 (701 A.2d 658), but the case was settled before argument in March, 1998 and the appeal withdrawn.

The first three factors of *Lagrew* are well established in this case as the base rent is below market value, the percentage payments are substantial in relation to the base rent, and the term of the lease is lengthy.

The fourth *Lagrew* factor is "whether the tenant may sublet". Wal-Mart may do so but under an even more restrictive basis than is set forth in *Lagrew*. Paragraph 1(c) of the 1985 amendment to the lease must be read in conjunction with the "assign or subletting" provisions on page six of the original Big K lease since such previous provision was incorporated by reference in the 1985 amendment.

Paragraph 1(c) of the 1985 amendment provides:

It is understood and agreed that the Demised Premises being leased shall be used by lessee in the operation of a discount department store, but Lessor agrees that the Demised Premises may be used for any lawful purpose, except for any purpose which is in conflict or competition with the Cowan's lease (apparel) and except for a grocery store or supermarket; any use by Lessee other than as a discount department store shall require the prior written approval of Lessor, which approval shall not be unreasonably withheld except in the case of prohibited uses aforesaid.

The assign or subletting provision of the original Big K lease provides:

The Lessee covenants not to assign, mortgage or encumber this

agreement or sublet or use or permit the demised premises, or any part thereof, to be used by others without the prior written consent of the Lessor, which consent shall not be unreasonably withheld. However, Lessor expressly agrees that Lessee may, without Lessor's consent, sublease or assign this lease to an affiliate or subsidiary.

There has been no consent at all by BVT and thus the right to sublease without consent to an affiliate or subsidiary as provided in the "assign or subletting" provision of the original lease is restricted by the section 1(c) provision of the 1985 amendment prohibiting use other than as "a discount department store".

Given these circumstances, the discussion in *Lagrew* is particularly pertinent:

> Fourth, while the limited sublease provision theoretically supports SupeRx's contention that the lease does not contemplate continuous operation by the lessee, the sublease term is so narrowly tailored that it implies that some suitable replacement business would occupy the leased space if not SupeRx. Thus, a more precise statement of the implied covenant is that the lessee, *or some suitable sublessee*, will continuously operate on the premises.

> Defendants attempt to persuade the Court that their right to sublease was not narrowly tailored and that the landlord's willingness to include this provision negates a finding of an implied covenant. SupeRx was prohibited from subleasing to a food store, department store, variety store, skating rink, beer tavern, liquor store, discount store, or any other business which would conflict with the exclusive rights granted by the landlord in leases to other tenants. "The presence of a right to assign or sublet is not necessarily inconsistent with an implied covenant of continuous operation. The two covenants can be harmonized to permit subletting or assignment to a business of the same character." First American Bank & Trust Co., 729 P.2d at 941. Obviously, the plaintiffs' predecessors intended for a SupeRx, or another fitting business, to occupy these premises.

*Lagrew, et al v. Hooks-SupeRx, Inc.*, 905 F.Supp. 401, 406-07 (E.D. Ky. 1995).

The trial court held that the 1985 amendment to the lease contained an implied covenant of continuous occupancy, and the preponderance of the evidence supports this conclusion.

-20-

Since this court affirms the finding that an implied covenant of continuous occupancy exists, the next question is whether or not "Bud's Discount City" is a "discount department store" within the contemplation of the parties at the time of the execution of the 1985 amendment to the lease. The trial court found as a fact that "Bud's" was not and the evidence does not preponderate against such finding. The "discount department store" contemplated by the parties in 1985 was the discount department store that since 1982 had more than quadrupled its gross receipts from $2,047,072.56 to $8,981,538.49. It was the "discount department store" that had increased percentage rentals to the landlord from $17,149.06 in 1982 to $43,130.77 in 1985. It was the "discount department store" that the parties, based on experience, had every right to believe would continue to grow and thereby benefit both BVT and Wal-Mart. True to its history after the 1985 amendment authorizing expansion, Wal-Mart increased its gross receipts to $29,551,354.91 and increased percentage rent to $123,513.55.

The "discount department store" known as "Bud's Discount City", the wholly owned subsidiary of Wal-Mart occupying the premises subsequent to 1995 has gross revenues of approximately $3,000,000.00 per annum.

"Bud's" did not exist in 1985 and is best characterized by the witness Tom Seay who was the author of the "Bud's" concept. He testified:

> THE COURT: When were they first created?
> THE WITNESS: Oh, gosh, I don't know the exact year. But I would say it had to be --
> THE COURT: Early '90s?
> THE WITNESS: Early '90s, yes, sir.
> THE COURT: Okay. For what purpose were they created?
> THE WITNESS: Well, actually, they were my idea.
> THE COURT: And I've got a pretty good idea of why you did it, but go ahead and tell me why.
> THE WITNESS: Well, what happened was, I approached David Glass, who is our president, and I told him that I thought we had an opportunity in some of the buildings that were vacant for us to put in another operation so we could make more money.
> I said, [s]ome of these markets are so good that we could put in another operation, similar to the Wal-Mart, and I said, I think we could make a lot of money doing that. And so what we did was, we looked at all of our vacant stores and said, Okay, on a market-by-market basis, do we think we could make money? And the ones that we thought we could, we opened up the Bud's Discount Stores

in. It was strictly to make money.

THE COURT: I understand. Okay. But you didn't create a competitor for yourself. You didn't do that? That wasn't done?

THE WITNESS: No, sir. But what we saw is, we saw a market opportunity.

THE COURT: Oh, I realize -- I understand that. But if there's a market opportunity there for a Wal-Mart, then it looks like to me it makes sense to put a Wal-Mart store there as opposed to something entirely different, you know.

THE WITNESS: But we already -- we would have a Wal-Mart.

THE COURT: You have a Wal-Mart --

THE WITNESS: This is in addition to the Wal-Mart.

THE COURT: Well, I understand that. But you've also got many Wal-Mart stores around in different cities, do you not? You've got more than one in a lot of different cities, do you not?

THE WITNESS: Yeah. But not in a town like Lebanon, Tennessee.

THE COURT: Well, I realize that. I understand that. But you did not create Bud's -- well, I guess I need to ask you. Did you create Bud's to be a competitor of Wal-Mart in a small town? That's really what you're talking about.

THE WITNESS: What we did was, we created Bud's to put in these stores because, number one, they were good locations; number two, the market would justify an additional discount store in the market; number three, we thought if we could put Bud's in and be successful, then maybe we would eliminate another competitor from coming in and picking up the void in the market; and, number four, we thought we would make money.[1]

A 1999 Lincoln Town Car is an automobile. A 1925 Model T Ford is an automobile. They are not the same. The question whether "Bud's Discount City" is *called* a "warehouse" or a "discount department store" does not matter. Bud's clearly is not what was contemplated as a "discount department store" by the parties in 1985 and thus not the type of store contemplated by the 1985 implied covenant of continuous occupancy. The assignment by Wal-Mart to Bud's was not an ". . . assignment to a business of the same character". *First American Bank & Trust Co. v. Safeway Stores, Inc.*, 729 P.2d 938, 941 (Ariz. App. 1986).

Wal-Mart has breached the implied covenant of continuous occupancy and

---

[1] An obvious side effect of this arrangement is that Wal-Mart retains 84,000 square feet in Lebanon Shopping Center at a fixed annual rental somewhere between 63% and 74% of the square foot market value of the space in 1985 for a period extending through the year 2005. It also has a cushion of over $15,000,000 per annum gross receipts before "Bud's" would ever reach the $18,133,333 percentage rental threshold.

is liable to the landlord for resulting damages.

III. MEASURE OF DAMAGES FOR BREACH OF AN IMPLIED COVENANT OF CONTINUOUS OCCUPANCY

"The measure of damages for breach of any contract is that which was reasonably contemplated by the parties. The general principle for assessment of damages for breach of contract is that the plaintiff is entitled to be placed, so far as can be done by money, in the same position he would have been in if the contract had been performed." *Hawkins v. Reynolds*, 62 Tenn. App. 686, 697, 467 S.W.2d 791, 795 (1971); *see also Chambliss, Bahner & Crawford v. Luther*, 531 S.W.2d 108 (Tenn. App. 1975); *Wilhite v. Brownsville Concrete Co.*, 798 S.W.2d 772 (Tenn. App. 1990) and *Action Ads, Inc. v. William B. Tanner Co.*, 592 S.W.2d 572 (Tenn. App. 1979).

This is in keeping with the "expectation interest" or "benefit of the bargain" rule generally applicable in sister jurisdictions. *See* 22 AmJur2d "Damages", section 45, p. 68.

This court has held: ". . . that our Tennessee decisions are firmly committed to the policy of granting the victim of a breached lease all of the damages which he sustained as a proximate result of the breach, so long as such damages are reasonably shown and capable of reasonably accurate ascertainment." *Ferrell v. Elrod*, 63 Tenn. App. 129, 153, 469 S.W.2d 678, 689 (1971).

We now address the issue of damages when an anchor tenant in a shopping center breaches a covenant of continuous occupancy express or implied. In the last decade, appellate courts of Nevada, Indiana, and North Carolina, as well as the 10th Circuit of the United States Court of Appeals, applying Oklahoma law, have addressed the issue.

The lineage of the difference-in-value measure begins with what a cynic might call the "Snake-bit Hornwood Trilogy" from Nevada. *Hornwood v. Smith's Food King No. 1*, was first decided by the Supreme Court of Nevada on

April 25, 1989.  In this opinion, reported in 772 P.2d at 1284, the Supreme Court of Nevada held the proper measure of damages for breaching the covenant of continuous occupancy to be the difference between the value of the shopping center with anchor tenant and the value without the anchor tenant.  The case was re-tried in the district court and appealed.  On March 6, 1991, the Nevada Supreme Court held that the trial court had failed to properly assess the Hornwood's damages for the diminished value of the shopping center.  *Hornwood v. Smith's Food King No. 1*, 807 P.2d 208 (Nev.1991).  In the meantime, the incumbent trial judge lost his bid for re-election and the case came on for a third trial before his successor.  On this third trial, the successor judge did not hold an evidentiary hearing but simply adopted the plaintiff's proof as to damages and entered judgment for $1,425,000.00.  On appeal, the Supreme Court of Nevada on August 28, 1992 reversed and remanded for a third time.  *Hornwood*, 836 P.2d 1241 (Nev. 1992).  In each of the *Hornwood* decisions, the Nevada Supreme Court reaffirmed its measure of damages set forth in the first decision in 772 P.2d 1284.

In holding that the diminution in value of the entire shopping center was the proper measure of damages, the Nevada Supreme Court stated:

> Smith's is a sophisticated business entity.  Smith's knew that its presence as the anchor tenant had a critical impact on the shopping center's success.  Without an anchor tenant, obtaining long-term financing and attracting satellite tenants is nearly impossible for a shopping center.  Perhaps most importantly, the anchor tenant insures the financial viability of the center by providing the necessary volume of customer traffic to the shopping center.  Therefore, we find that the district court clearly erred in concluding, as a matter of law, that the diminution in value of the Hornwoods' shopping center was unforeseeable. *Conner*, 103 Nev. at 356, 741 P.2d at 801.  Accordingly, we reverse that portion of the district court's ruling and remand to the district court for an assessment of the Hornwoods' damages as a consequence of the loss of their anchor tenant.

*Hornwood v. Smith's Food King No. 1,* 772 P.2d 1284, 1286 (Nev. 1989).

In *Pleasant Valley Promenade v. Lechmere Inc.,* 464 S.E.2d 47 (N.C.App. 1995), the North Carolina Court of Appeals, in reversing judgment non obstante veredicto following an $8,000,000 verdict for the plaintiff, determined this

question of first impression with reliance on *Hornwood*. Said the court:

> In the context of a breach of contract between the anchor store and the shopping center in which it resides, we recognize there are often extensive damages. *See Hornwood v. Smith's Food King No. 1*, 107 Nev. 80, 807 P.2d 208 (1991); Tyson, *Drafting, Interpreting, and Enforcing Commercial and Shopping Center Leases*, 14 CAMPBELL L.REV. 275 (1992). These damages result because the shopping center is a "cooperative enterprise, with each store's success dependent on the continued operation of the other stores . . . ." *Dover Shopping Center, Inc. v. Cushman's Sons, Inc.*, 63 N.J.Super. 384, 164 A.2d 785, 790 (Ct.App.Div.1960). The contribution of each store determines the flow of business of the entire shopping center, and likewise, a store leaving affects the center as a whole. *See W & G Seaford Associates, L.P. v. Eastern Shore Markets, Inc.*, 714 F.Supp. 1336, 1348 (D.Del.1989). Though a shopping center is 'cooperative" in nature, the anchor store is the focal point of the entire shopping center. Tyson, 14 CAMPBELL L.REV. 301-303. The function of the anchor is "to provide certainty of income stream, an identity and stability for the center which, in turn, draws customers, attracts other tenants and increases overall sales." *Id.* at 303. Further, without an anchor store long-term financing is virtually impossible to obtain. *Hornwood v. Smith's Food King No. 1*, 105 Nev. 188, 772 P.2d 1284, 1286 (1989). Therefore, the anchor's loss has been described as "worse than a flood, fire or tornado, because usually there is insurance to cover [natural] disasters." Tyson, 14 CAMPVELL L.REV. at 303.

> Pleasant Valley installed Lechmere as the Center's anchor store based on Lechmere's product mix, value offered, aggressive advertising method, and regional drawing power. Lechmere, in breach of the Agreement, abandoned the Center. As a result of Lechmere's abandonment, Pleasant Valley claimed damages arising from: (1) harm to the overall probability of success of the Center; (2) harm to the fair market value of the Center; and (3) harm to the Center's ability to attract and retain non-anchor tenants and a corresponding reduction in customer traffic and the attendant decrease in sales revenue.

> Therefore, consistent with the guidance of our Supreme Court, we believe a damages remedy should be available to Pleasant Valley which promotes the frequently declared objective of placing "the injured part[y] in as good a position as they would have been in if the contract had not been breached . . . ." Knapp, COMMERCIAL DAMAGES: A GUIDE TO REMEDIES IN BUSINESS LITIGATION, § 1.02 (Matthew Bender 1995). Accordingly, we conclude the damages measure asserted by Pleasant Valley, diminution in market value, is recoverable in a breach of contract action.

*Pleasant Valley Promenade v. Lechmere Inc.*, 464 S.E.2d 47, 61-62 (N.C. App.

1995).  An appeal of *Lechmere* was granted by the Supreme Court of North Carolina (472 S.E.2d 18), but on December 10, 1996 before argument in the supreme court the case was settled and the appeal withdrawn.  *Pleasant Valley Promenade v. Lechmere Inc.,*  345 N.C. 346, 484 S.W.2d 92 (N.C. 1996).

Almost simultaneously with *Lechmere,* the Court of Appeals of Indiana decided *Scott-Reitz Ltd. v. Rein Warsaw Associates,* 658 N.E.2d 98 (Ind. 1995). Again, relying on *Hornwood,* the Indiana Court of Appeals established a diminution of value approach involving the entire shopping center.  This was done in part by an income capitalization approach similar to the plaintiff's proof in the case at bar.  In adopting the diminution of market value approach to damages the court stated:

> Scott argues the trial court's award contains anticipated lost future rental profit, from the B tenants, which is too speculative an amount to properly base an award of damages.  Evidence of future profits was relevant, insofar as it applied to the value of the Lease on the date of the breach.  Rein's evidence of future profits was relevant not as to anticipated lost profits as such, but rather as going to the fair market value of the Lease.  See *Annon II* 597 N.E.2d at 326-238.

*Scott -Reitz Ltd. v. Rein Warsaw Associates,* 658 N.E.2d 98, 106 (Ind. Ct. App. 1995).

The trial court in the case at bar awarded compensatory damages in the amount of  $2,507,674 representing the present value of lost future percentage rents for the duration of the lease.  This was apparently based upon the alternative measure of damages testimony offered by the witness Samuel R. Boles.

In the examination of the witness Boles the record shows:

Q.    Now, let me ask you, please, sir, with respect to damages here -- and I'll just tell the Court initially, we've calculated the damages in two different manners.  Let me ask you first whether or not you've done these calculations.  The first one, Mr. Boles, is the difference in the value to this center, to the owners, BVT, the plaintiff here, with and without Wal-Mart in place.  Have you done that calculation?

* * *

Q. What's the number, Mr. Boles?

A. 4.7 million.

Q. And that is what the center is worth less as a result of Wal-Mart not being there?

A. Right.

Q. Tell the Court how you calculated that number.

A. Using actual scheduled rents and actual experience of expenses and capitalizing the net income.

Q. Have you done this more than once in your life?

A. Many, many times. As an example, and to answer Mr. Comstock, I have within the last 24 months bought and/or sold eight different retail investments. I have two currently under contract. This is something I do frequently is value property, both for acquisition and sales.

Q. Let me ask you, please, sir, this is a big number. I want you to concisely but adequately explain to the Judge exactly how you calculated it. You said you took projected rents, actual rents. Walk us through that. Just take a couple of minutes and walk us through that.

* * *

A. Your Honor, what I did is in the last year of operating, which was 12/31/96 on the calendar year, when Bud's was obviously operating in the premises, I took the base and actual scheduled rents, I took the expense reimbursements, the actual ones, I took the actual vacancy, and come up with the total receipts, actual receipts for 1996, which is $785,264.

I took the actual expenses, Your Honor, of 204,585, which is a net income of 580,679. We had capital expenses, Your Honor, of tenant improvements and replacement reserve which is computed at 10 cents per square foot, totaling 56,420, leaving a net cash flow of $524,259.

I researched the market to find out what capitalization rate would be used, Your Honor, for properties with a Bud's operating in the premises. And the research in the marketplace told me at minimum it would be 12 ½ to 15 percent. And in this analysis, I used 14 percent. And I came up with a value, Your Honor, of 3,745,000 as a Bud's.

I took the last full year of operating year, Your Honor, for the Wal-Mart store. I took the actual scheduled leases that were at the shopping center.

* * *

Q. Okay, Mr. Boles. You've given us an evaluation on the method described by you that showed the value of the center without Wal-Mart there in the sum of $3,745,000; correct?

A.    Correct.

MR. WHITE:  I think Mr. Agee wants to look at my chart that they didn't want us to see.  But that's fine.  We'll note that.

BY MR. WHITE:

Q.    Now, I'm asking you, please, sir, about your evaluation of this center had Wal-Mart stayed.  And I've cut you off in this dialogue, but start one more time.

A.    I used the last full year, fiscal year that Wal-Mart – excuse me, calendar year, '94, that Wal-Mart was operational.  I took the actual scheduled leases of the existing tenants as well as their option terms.  More in particularly, I was looking at this particular year.

I took the base rent and the percentage rent that Wal-Mart paid or would have owed for that year, the expense reimbursements that would have been paid for that year, less the vacancy of 4 ½ percent.  The total receipts were $1,072,779.

The expenses were increased to 223,131 as a result of the increase in tax base subsequent to Wal-Mart being operational.  The net income was 849,648.  The capital expenses and the replacement reserves totaled 26,535, resulting in a net cash flow of $823,113.

Now, similarly, as I did the other example, I questioned investors.  And with Wal-Mart operational and Wal-mart as an integral part of this investment, capitalization rates ranged from 9 and a quarter to 9 and three-quarters.

I used the top end of that spectrum.  And I come up with a value of $8,440,000, for a difference in value of 4,695,000 or $4,700,000.

Q.    I'm sorry?

A.    Rounded to 4,700,000.

Q.    But the precise number in difference in this center without a Wal-Mart present is a decrease in value of $4,695,000; correct?

A.    That's correct.

While Mr. Bole's testimony was admitted over the repeated objections of Wal-Mart, it is consistent with the market value approach of *Hornwood, Lechmere, supra, Scott-Reitz Ltd.*, *supra*, and *John A. Henry & Company, Ltd. v. TG&Y Stores*, 941 F.2d 1068 (10th Cir. 1991).

Since no other evidence in the record addresses diminution of market value of the shopping center as the measure of damages, and since this court finds diminution in market value of the shopping center to be the proper measure of damages for breach of the implied covenant of continuous occupancy, the judgment of the trial court will be modified to reflect such damages in the amount of $4,695,000.

IV. THIRD PARTY RECEIPTS

Within the leased premises, Wal-Mart allowed Medco Drugs, Inc. to operate a pharmacy. During the last two years that Wal-Mart and Medco occupied the leased premises, percentage rent was not paid by Wal-Mart on gross receipts attributable to Medco sales.

The trial court granted partial summary judgment to BVT holding that the applicable lease agreement in this respect was unambiguous. This holding is clearly correct.

The assigning and subletting provision of the agreement states:

> The Lessee covenants not to assign, mortgage or encumber this agreement, or sublet or use or permit the demised premises, or any part thereof, to be used by others without the prior written consent of the Lessor, which consent shall not be unreasonably withheld. However, Lessor expressly agrees that Lessee may, without Lessor's consent, sublease or assign this lease to an affiliate or subsidiary.

If Medco is in fact a third party, no written consent of the lessor was ever sought or received. If Medco is an operating department of Wal-Mart, then its gross receipts are Wal-Mart's gross receipts and Wal-Mart, within the demised premises, cannot divide itself into component parts to the end of reducing its gross receipts.

We observe that Wal-Mart did not segregate its gross receipts attributable to Medco sales until the last two years of its operations, which was after the lawsuit at bar had been filed.

> 'Parties are far less liable to have been mistaken as to the meaning of their contract during the period while harmonious and practical construction reflects that intention, than they are when subsequent differences 'have impelled them to resort to law, and one of them then seeks a construction at variance with the practical construction that they have placed upon it of what was intended by its provisions.'

*Pigg v. Houston & Liggett*, 8 Tenn. App. 613, 633-34 (1928). (citing 6 R.C.L. p. 853 sec. 241.) *See also McDowell v. Rambo*, 21 Tenn. App. 448 111 S.W.2d 892, 899 (1937).

Having affirmed the trial court's determination that Wal-Mart is liable for percentage rent based on Medco's gross receipts, this court moves to determine the amount underpaid, which should be a simple matter of mathematics. Indeed, the affidavit of Kandy Beaver, supervisor of the accounting department of Wal-Mart, given February 25, 1997, would appear conclusive on this point. She states, "Attached hereto . . . is a computation reflecting (a) historically, what Wal-Mart actually paid (b) what additional should have been paid if third party receipts are to be included ($108,759.23); and (c) what should have been paid (and what is due Wal-Mart, $186,501.77) if third party receipts are not to be included."

The court has determined that third -party receipts are to be included and the figure provided by Wal-Mart and used by the trial court in its judgment for third party receipts rentals is $108,759.23.

The judgment of the trial court in this respect is affirmed.

V.     THE RIGHT TO A JURY TRIAL

Neither party asked for trial by jury in their original pleading. By amended complaint, BVT sought the recovery of percentage rental on "third party" receipts realized by Medco.

In its answer to this amended complaint on July 5, 1996, Wal-Mart noted on the face of such answer "Jury Trial Requested". Such a demand is adequate under Rule 38.02 if, in fact, the amended complaint and the answer thereto present additional questions of fact. The trial court held that no such additional facts were presented by the amended complaint and answer thereto but only issues of law were tendered.

This issue involves contract interpretation for the court. If BVT was correct in its interpretation (acquiesced in by Wal-Mart until after suit was filed) Wal-Mart owed BVT for Medco sales subsequent to the reversal of position by Wal-Mart. If Wal-Mart's interpretation of the contract was correct, and such "third party" receipts were not includable in Wal-Mart's gross receipts, then BVT

owed Wal-Mart reimbursement for previously paid percentage rent based upon Medco gross receipts. There being no dispute as to the applicable contract provisions, and no ambiguity therein, the interpretation thereof is a question of law for the court. *Petty v. Sloan*, 197 Tenn. 630, 277 S.W.2d 355 (1955).

Once the court determines the question of law as to contract interpretation the amount owed should be and in fact is, under this record, a mathematical certainty. Such is established by Wal-Mart's own proof in the form of the Kandy Beaver affidavit of February 25, 1997. If BVT's interpretation is correct, the amount owed by Wal-Mart is $108,759.23. If, on the other hand, Wal-Mart is correct in its interpretation of the contract, BVT owes Wal-Mart $186,501.77. There simply is no factual dispute.

This mathematical certainty is explicitly recognized in Wal-Mart's brief wherein it is stated at footnote 11 on page 39 of the brief: "This should include a judgment on Wal-Mart's counter-claim for its position that it inadvertently overpaid BVT for a number of years; it is undisputed that amount of such overpayment is $186,501.77 . . . ." (emphasis added). It is equally undisputed that the amount owed to BVT, if the contract interpretation question of law is decided in its favor, is $108,759.23. It is exactly this latter amount plus calculable interest thereon that was awarded by the trial court. The third party complaint, the answer thereto, and the counter-complaint raised only issues of law and not issues of fact.

"There is no right to jury trial where there is no issue of fact but only a question of law in a case. *State v. Moore*, 206 Tenn. 95, 332 S.W.2d 176-77 (1960) (citations omitted).

"In order to create a jury question there must be a conflict in substantial evidence. Accordingly, the right to trial by jury does not apply when there is no genuine issue of fact to be tried, nor does it apply to issues that are matters of law." 47 AmJur.2d Jury, § 16, p. 724.

The chancellor was correct in denying Wal-Mart's request for trial by jury.

VI.   SANCTIONS

By order entered on September 9, 1997, the trial court imposed sanctions against Wal-Mart in the amount of $6,240, representing auditors fees for work done in Bentonville, Arkansas, on May 27, 28, and 29, 1997.

This court can find no justification for the imposition of such sanctions under the record in this case.  The audit was for the purpose of calculating the amount of  "third party" sales of Medco.  This court has affirmed the mathematical certainty of this amount in our discussion of the jury trial right. Unless there were questions of fact still to be resolved following the Kandy Beaver affidavit, there was no reason for the May, 1997 audit in the first place. If such questions of fact existed as would justify further audit, it would necessarily follow that Wal-Mart's answer to the third party complaint tendered issues of fact and Wal-Mart's jury demand was well taken.  The record at trial, however, does not bear out such fact issues that would justify the audit, and comments by the court at the hearing of July 15, 1997, relative to these sanctions is revealing.

The patience of the trial judge with counsel and with Wal-Mart reached its breaking point at this hearing which resulted in an extended lecture to counsel for Wal-Mart relative to its alleged failures to produce proper records at the May, 1997 audit.   After the trial court had, at length, vented its frustration upon counsel for Wal-Mart about the proposed audit of these "third party" receipts of Medco, the following exchange occurred:

> MR. WHITE:  When we started the trial, Your Honor had already granted our motion for partial summary judgment and had denied the motion of Wal-Mart to reconsider.  We put Mr. Boles on the stand.
>
> Mr. Boles testified that he took the -- he did a calculation of the damages.  Your Honor listened to it.  He started with the $108,000, which was admitted by Wal-Mart was the amount in their calculation that was owed.  He put interest on that.  It was tendered as an exhibit.
>
> And the number that he gave, may it please the Court, and I'm reading specifically from the transcript, the number that he calculated was $144,689.75.  And he testified, quote, "that is through January 31st of 1997.  We have a per diem figure of $39.64 per day."

May it please the Court, I took the months of February, March, April, May, and June, which total exactly 150 days. So that would be through the end of the month of June. That's 150 days times the per diem figure of $39.64. That is an additional $5,946. And when that is added to the testimony that Your Honor heard and approved when this man testified, that gives the number that's set out in that order of $150,635.75.

THE COURT: Well, Mr. White, is this what we're talking about now? What is this for?

MR. WHITE: This is for the partial summary judgment.

THE COURT: I realize that. Is that for the sales of the drugstore?

MR. WHITE: Yes, Your Honor.

THE COURT: Well, what are we doing? Why have I just got through talking to Mr. Comstock about all these matters if you've done figured it out?

MR. COMSTOCK: That's exactly right, Your Honor.

BVT asserts correctly that the $108,759.23 figure set forth in the affidavit of Kandy Beaver of February 25, 1997 is conclusive and indeed undisputed as to the amount of Medco sales to be included in gross receipts if the BVT interpretation of the contract is correct. The BVT interpretation of the contract, accepted by the trial court and accepted by this court, results in the mathematical certainty evidenced by the Kandy Beaver affidavit. Thus, the answer of Wal-Mart to the BVT amended complaint tendered no issue of fact for trial by jury. BVT cannot have it both ways. Either the Kandy Beaver affidavit is conclusive of the fact issue about the extent of Medco gross receipts for all purposes or it is simply evidence of such gross receipts to be considered along with other evidence in which case the sanctions imposed would be in the sound discretion of the court. The other edge of this sword is that in such case, issues of fact were tendered by the answer to the amended complaint and Wal-Mart's demand for trial by jury on all issues would be well taken. This court concludes that there is no genuine dispute of the figures in the Kandy Beaver affidavit and that the imposition of sanctions was improper and should be reversed.

VII. ATTORNEY FEES

The trial court awarded attorney fees under the lease contract in favor of BVT in the amount of $170,042.61 through June 30, 1997.

The awarding of these attorney fees is provided for in the contract, and the amount thereof is generally within the discretion of the trial judge. The factors identified for guidance of the trial judge are set forth in *Conners v. Conners*, 594 S.W.2d 672 (Tenn. 1980). The award of attorney fees will be modified to disallow any attorney fees for work done on the "third party" receipts issue, subsequent to the filing before the trial court of the Kandy Beaver affidavit of February 25, 1997. In all other respects the award of attorney fees is affirmed.

VIII. CONCLUSION

In this case, the court adopts a measure of damages conforming to the diminution of value of the entire shopping center rule, having its recent genesis in *Hornwood*. This diminution of value rule was further developed in the 1995 cases of *Pleasant Valley Promenade v. Lechmere, Inc.*, 464 S.E.2d 47, 61-62 (N.C. App. 1995) and *Scott-Reitz Ltd. v. Rein Warsaw Associates*, 658 N.E.2d 98 (Ind. 1995).

It must again be noted that the Supreme Court of North Carolina granted an appeal from *Lechmere* but before argument could be held before that court of last resort, the parties settled the case and the appeal was withdrawn. The diminution of value of the entire shopping center approach appears to this court to be consistent with *Ferrell v. Elrod*, 63 Tenn. App. 129, 154-55, 469 S.W.2d 678, 689 (1971).

Under the facts presented herein, this court finds, applying the factors recognized by the Supreme Court of Tennessee in *Kroger v. Chemical Securities Co.*, 526 S.W.2d 468 (Tenn. 1975), an implied covenant of continuous occupancy. Perhaps most expressive of the developing law relative to such implied covenants is the rule articulated by the court in *Pequot Spring Water Co. v. Brunnell*, 46 Conn. App. 187, 698 A.2d 920 (1997). It is again well to note that the Supreme Court of Connecticut granted an application to appeal in the *Brunnell* case but that before the case could be argued in the Supreme Court of Connecticut it was settled and the appeal withdrawn in March, 1998.

This court having found an implied covenant of continuous occupancy

under the facts of this case, and having adopted the diminution of market value of the entire shopping center as the proper of damages, the judgment of the trial court as to damages is modified to reflect total damages for such diminution in value in the amount of $4,695,000.

The award of damages by the trial court for "third party" receipt rentals as to Medco sales is affirmed.

The award of sanctions by the trial court against Wal-Mart is reversed.

The award of attorney fees to BVT is modified to disallow attorney fees to the extent such fees reflect work on the "third party" receipts issue past the time when the Kandy Beaver affidavit of February 25, 1997 was filed with the court.

As modified herein, the decree of the chancellor is affirmed and the case is remanded for further proceedings in conformity with this opinion.

Costs of the appeal are assessed against Wal-Mart.

_____
WILLIAM B. CAIN, JUDGE

CONCUR:

_____
WILLIAM C. KOCH, JR., JUDGE

_____
DAVID WELLES, SPECIAL JUDGE